UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TIFFANY HSUEH,

Plaintiff,

No. 15-cv-03401 (PAC)

-against-

THE NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES a/k/a THE DEPARTMENT
OF FINANCIAL SERVICES and ABRAHAM
GUEVARA, *Individually*,

Defendants.

---

## DECLARATION OF EVA L. DIETZ

EVA L. DIETZ hereby declares as follows:

1.      I am an Assistant Attorney General in the Office of New York State Attorney

General Eric T. Schneiderman, counsel for defendant New York State Department of Financial

Services ("DFS") in this action, and am admitted to practice before this Court.  I make this

declaration in support of DFS's motion for spoliation sanctions against plaintiff Tiffany Hsueh.

2.      Attached hereto as Exhibit A is a true and correct copy of a letter from DFS to

defendant Abraham Guevara, dated August 15,[1] which was produced in this matter by Guevara.

3.      Attached hereto as Exhibit B is a true and correct copy of a letter to DFS from

plaintiff's attorney, Joshua Frank, Esq., dated February 2, 2015, which was produced in this

matter by DFS.

4.      Attached hereto as Exhibit C is a true and correct copy of an excerpt from the

---

[1] [1] The letter is incorrectly dated 2015 rather than 2014.  It is undisputed that Guevara retired from DFS in September 2014, shortly after plaintiff filed an internal complaint against him in August 2014.  See Complaint ¶¶ 34-35.  Accordingly, the letter could not have been sent in 2015.  Indeed, by August 15, 2015, this lawsuit had already been filed, both defendants had answered, and the parties were preparing for mediation.  See Docket Nos. 1, 9-11.

transcript of plaintiff's deposition, taken by defendants in this matter on April 20-21, 2016, which describes the spoliation at issue in this motion.

     5.      Attached hereto as Exhibit D are true and correct copies of additional excerpts from the transcript of plaintiff's deposition.

I declare under penalty of perjury that the foregoing is true and correct.  This declaration was executed by me in New York, New York on this 13th day of July 2016.

_____
Eva L. Dietz

Exhibit A



### NEW YORK STATE
## DEPARTMENT *of*
## FINANCIAL SERVICES

Andrew M. Cuomo
Governor

Benjamin M. Lawsky
Superintendent

August 15, 2015

**<u>HAND DELIVERY</u>**

Mr. Abraham B. Guevara
30 47 12th Street
Long Island City, NY 11102

Dear Mr. Guevara:

This is to inform you that the Department of Financial Services is placing you on administrative leave effective immediately pending the results of an investigation into alleged misconduct on your part.

Please be advised that you are directed not to report to work until further notice from the Office of Human Resources Management. In addition, while on administrative leave you are directed to refrain from visiting the premises of the Department of Financial Services located at One State Street, New York, NY.

Should you have any questions concerning this matter, they may be directed to Scott Gollop, the Director of Labor Relations or me at (212) 709-5448.

Sincerely,

Marie Allen Campbell
Director, Human Resources Management

Cc:  Cheryl Aini
     Scott Gollop

Exhibit B



**PHILLIPS & ASSOCIATES**

*ATTORNEYS AT LAW*

45 Broadway Suite 620, New York, NY 10006
Tel: 212-248-7431  Fax: 212-901-2107
WWW.NYCEMPLOYMENTATTORNEY.COM
A PROFESSIONAL LIMITED LIABILITY COMPANY

February 2, 2015

*Personal & Confidential*
Benjamin M. Lawsky
Superintendent of Financial Services
New York State Department of Financial Services
One State Street
New York, NY 10004

RE:   Tiffany Hsueh v. The New York State Department of Financial Services, et. al.

Dear Mr. Lawsky:

Please be advised that this office represents Tiffany Hsueh regarding claims of sexual harassment and gender discrimination against The New York State Department of Financial Services and Abraham Guevara.  The enclosed Complaint sets forth a detailed recitation of the facts alleged.

This letter is being sent preliminarily to a lawsuit in a good faith attempt to resolve this matter. Please be advised that it is extremely important that all documents and surveillance footage maintained by the Department relating to this matter be immediately protected from destruction and preserved.  Those documents and footage could be evidence relevant to this dispute and failure to preserve evidence can result in significant sanctions.  The obligation to preserve documents and surveillance footage extends to each employee of the Department and to all documents and video footage relating to this matter, regardless of their form or format (*i.e.*, paper documents, word processing or spreadsheet files, e-mails, physical apparatuses [phones, etc.] and any similar computer files or data.)  Those documents and surveillance footage must be preserved from this point forward.  If insiders or affiliates of the Department have documents or video footage related to this matter, this litigation hold should also extend to such entities.

Kindly contact me or have your legal representative contact me by 12:00 p.m. on February 17, 2015 to discuss this matter.  If I do not hear from you or your counsel by then, I shall assume the Department has no interest in discussing an amicable resolution, and we shall immediately thereafter commence the litigation process by filing a Charge of Discrimination with the EEOC.  Thank you for your cooperation in this regard.

Sincerely yours,

PHILLIPS & ASSOCIATES

JOSHUA P. FRANK, Esq.

Enclosure

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X   Case No.

TIFFANY HSUEH,

Plaintiff,

**COMPLAINT**

-against-

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

THE NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES a/k/a THE DEPARTMENT
OF FINANCIAL SERVICES and ABRAHAM
GUEVARA, *Individually*,

Defendants.

----------------------------------------------------------X

Plaintiff, TIFFANY HSUEH, by her attorneys, PHILLIPS & ASSOCIATES, Attorneys at

Law, PLLC, hereby complains of the Defendants as follows:

## NATURE OF THE CASE

1.    Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42

U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991,

Pub. L. No. 102-166 ("Title VII")), and the New York City Human Rights Law, New York

City Administrative Code § 8-502(a), *et. seq.,* and seeks damages to redress the injuries

she has suffered as a result of being sexually harassed and discriminated against on the

basis of gender by her employer.

## JURISDICTION AND VENUE

2.    Jurisdiction of this Court is proper under 42 U.S.C. §2000e-5(f)(3), and 28 U.S.C. §§1331

and 1343.

3.    The Court has supplemental jurisdiction over the claims of Plaintiff brought under the New

York City Human Rights Law pursuant to 28 U.S.C. §1367.

4. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) as the occurrences giving rise to this action took place within the Southern District of New York.

### PROCEDURAL PREREQUISITES

5. Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunity Commission ("EEOC").

6. Plaintiff received a Notice of Right to Sue from the EEOC, dated _____, with respect to the herein charges of discrimination. A copy of the Notice is annexed hereto.

7. This Action is being commenced within ninety (90) days of receipt of said Right to Sue.

### PARTIES

8. Plaintiff TIFFANY HSUEH ("HSUEH") is a resident of the State of New York and Kings County.

9. Defendant THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES a/k/a THE DEPARTMENT OF FINANCIAL SERVICES ("DFS") is a state governmental department, duly existing pursuant to, and by virtue of, the laws of the State of New York, with a main office located at One State Street, New York, New York 10004.

10. DFS is responsible for regulating financial services and products, including those subject to New York State laws.

11. Plaintiff is a Grade 18 employee of Defendant DFS at the main office.

12. At all times relevant hereto, Defendant ABRAHAM GUEVARA ("GUEVARA") was a Grade 31 employee of DFS, holding the position of Supervisory Examiner.

13. At all times relevant hereto, Defendant GUEVARA held a senior supervisory position at DFS.

14. Defendants DFS and GUEVARA are referred to herein collectively as the "Defendants."

2

## MATERIAL FACTS

15. Defendant DFS hired Plaintiff HSUEH as an Insurance Examiner, and she began her employment in October, 2010, earning a yearly salary of approximately $40,000.

16. Beginning in July, 2012, Defendant GUEVARA would consistently walk by Plaintiff's cubicle and make conversation. Soon thereafter, he began inviting her to lunch on occasion. Plaintiff did not suspect anything untoward from the Defendant, a Grade 31 Supervisory Examiner, who initially appeared to be a pleasant, older colleague.

17. However, in January, 2014, the Defendant began his campaign of continuous, severe and frightening sexual harassment of the Plaintiff. The following paragraphs constitute only some examples of Defendant's unlawful discrimination.

18. Defendant GUEVARA consistently called Plaintiff names such as "Miss beautiful" despite Plaintiff's obvious discomfort.

19. Furthermore, the Defendant admitted to Plaintiff HSUEH that he checked her cubicle every morning to see whether she was in the office. In fact, Plaintiff repeatedly observed the Defendant watching her as she sat in her cubicle, causing her trepidation.

20. The Defendant insisted that Plaintiff accept various gifts despite her objections, including but not limited to, food, painted clay Dalmatians, a Christmas tree angel, small bottles of shampoo and conditioner, a hair clip, baseball caps, pens, and, most offensive, a necklace that Defendant's wife had given to him. Plaintiff was extremely uncomfortable receiving these gifts, but Defendant would not relent until Plaintiff reluctantly accepted these "gifts."

21. In May, 2014, the Defendant approached the Plaintiff and grabbed her cellular phone from her grasp, scrolling through the Plaintiff's stored photographs without the Plaintiff's permission. Plaintiff felt that her privacy was being violated, but she was completely taken aback when the Defendant asked her to send him a picture of herself to his cellular phone.

3

DFS0493

At this point, Plaintiff was growing increasingly more uncomfortable with Defendant's sexual harassment, which was beginning to create a hostile work environment for her.

22.    Later in May, 2014, Defendant GUEVARA called Plaintiff's office telephone while he was on vacation because he "wanted to hear [Plaintiff's] voice" and "missed having lunch with [Plaintiff]."

23.    On July 3, 2014, Defendant's sexual harassment took an extremely severe turn for the worse.    Scared to refuse his insistent invitation, Plaintiff reluctantly accompanied Defendant to lunch.   While returning from lunch to the office, the Defendant purposely kept bumping into the Plaintiff, brushing up against her arm, and at times trying to grasp her arm.  At this point, Plaintiff was extremely frightened.  Next, while walking onto a very narrow escalator in the subject office building, the Defendant walked onto the same step as Plaintiff, breathing into her ear.  Plaintiff could feel the Defendant's body heat and panicked, feeling as though she was trapped.  The Defendant also grabbed the Plaintiff's arm, pressing himself against her.  **When the Defendant and Plaintiff entered DFS's elevator, the Defendant waited until everyone else got off and then pulled Plaintiff close to him, kissing her on her cheek near her ear.**

24.    On July 7, 2014, the Defendant telephoned Plaintiff four times.  He telephoned her two more times on July 11, 2014.

25.    Terrified by Defendant's physical sexual harassment, Plaintiff covered the windows of her cubicle on July 8, 2014 so that the Defendant would no longer be able to spy on her.

26.    The following day, July 9, 2014, the Defendant left another harassing voicemail on Plaintiff's office phone, telling the Plaintiff that he missed her.  Within the next 24 hours, Defendant called Plaintiff's office phone a total of six times after it became clear Plaintiff was not returning his calls.

4

DFS0494

27. At this point, Plaintiff felt overwhelmed and reported all of Defendant's unlawful conduct to her immediate supervisor, Supervising Examiner Jody Wald, on July 9, 2014. Mr. Wald then asked Plaintiff what she wanted to do, and she told him to please order Defendant GUEVARA to leave her alone.

28. On July 14, 2014, Mr. Wald told Plaintiff HSUEH that Rolf Kaumann, the head of DFS's Insurance Division, had spoken to Defendant GUEVARA and had issued a warning to stay away from the Plaintiff. Mr. Wald told Plaintiff she could file a complaint with Human Resources if she wished, but Plaintiff stated that she would hold off for the time being, hoping that Mr. Kaumann's warning was sufficient.

29. The very next day, Plaintiff returned from lunch in shock to find a missed call from the Defendant on her office telephone log. In light of Mr. Kaumann's warning to the Defendant to stay away from her, Plaintiff could not believe he had tried calling her.

30. On July 18, 2014, Plaintiff met with DFS counselor Maureen Barnes-Kellman to discuss Defendant's sexual harassment and how emotionally distressed the Plaintiff was feeling.

31. Meanwhile, Plaintiff continued her efforts to avoid the Defendant.

32. However, on August 5, 2014, Plaintiff walked passed the Defendant while heading to the restroom. The Defendant was standing outside of the restroom and asked Plaintiff if he could speak with her privately. Plaintiff shook her head and ran into the bathroom. Later, she emailed her supervisors, Mr. Wald and Principal Examiner March Allen, to advise them that Defendant was not heeding Mr. Kaumann's warning to avoid all contact with her.

33. On August 7, 2014, Plaintiff spoke to her supervisors so she could determine how to deal with the Defendant's menacing sexual harassment. Rather than responding to Plaintiff's complaints of sexual harassment with a serious investigation, Mr. Wald merely told

5

DFS0495

Plaintiff he would speak to the Defendant and remind him to leave the Plaintiff alone. Plaintiff notified her supervisors that she was going to file a formal complaint with Human Resources if Defendant approached her again.

34. After the Defendant followed the Plaintiff around during a Department picnic on August 8, 2014, Plaintiff filed a formal sexual harassment complaint with Human Resources.

35. Despite Plaintiff's formal complaint to Human Resources, the Plaintiff was completely excluded from Defendant DFS's "investigation." Furthermore, the purported investigation has dragged on for months while DFS has allowed Defendant Guevara to "retire" in September, 2014 rather than face the consequences of his persistent and blatant sexual harassment.

36. Although Plaintiff kept following up, Allison Clavery of Human Resources would simply tell her to "stay quiet," failing to take her allegations seriously. In fact, Ms. Clavery admonished Plaintiff to "stay quiet" approximately a dozen times. Ms. Clavery appeared unconcerned regarding the actual substance of the "investigation."

37. To date, DFS has not informed Plaintiff about anything regarding its investigation despite her requests to be apprised of the findings.

38. Moreover, after Defendant's "retirement," DFS has continually permitted him to enter the property. Upon information and belief, the Defendant was in the subject office building three times since his retirement. For example, on December 10, 2014, he was allowed in the vicinity of Plaintiff's cubicle on the fourth floor of Defendant DFS's office.

39. Rather than facing discipline, DFS continues to reward Defendant Guevara, allowing him to "retire" and return to the office and organizing a monetary collection for his "retirement."

6

DFS0496

40. As a result of Defendant GUEVARA's unlawful conduct, Plaintiff has been traumatized and withdrawn at work. She is no longer at ease with male colleagues beyond those in her immediate departmental group.

41. Defendants created a hostile working environment, which has unreasonably interfered with Plaintiff's work environment.

42. Plaintiff was treated differently by her a senior-level supervisor, Defendant GUEVARA, solely due to her gender (sexual harassment).

43. Plaintiff has been unlawfully discriminated against, humiliated, degraded, and belittled, and, as a result, suffers loss of rights, emotional distress, and physical injury.

44. The Defendants' actions and conduct were intentional and intended to harm Plaintiff.

45. As a result of the acts and conduct complained of herein, Plaintiff has suffered emotional pain, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

46. As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdictional limits of the Court.

47. Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff demands punitive damages as against both Defendants, jointly and severally.

### AS A FIRST CAUSE OF ACTION
### FOR DISCRIMINATION UNDER TITLE VII
### (Not Against Individual Defendant)

48. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

49. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., for relief based upon the unlawful

7

DFS0497

employment practices of Defendant DFS.  Plaintiff complains of Defendant's violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's gender (sexual harassment).

50.     Defendant engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et. seq., by discriminating against Plaintiff because of her gender (sexual harassment).

### AS A SECOND CAUSE OF ACTION FOR DISCRIMINATION
### UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

51.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

52.     The New York City Administrative Code §8-107(1) provides that, "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

53.     Defendants engaged in unlawful discriminatory practices in violation of New York City Administrative Code §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff because of her gender (sexual harassment).

### AS A THIRD CAUSE OF ACTION FOR DISCRIMINATION
### UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

54.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

55.     The New York City Administrative Code §8-107(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite, compel or coerce the doing of

8

DFS0498

any of the acts forbidden under this chapter, or attempt to do so."

56.    Defendant GUEVARA engaged in unlawful discriminatory practices in violation of New York City Administrative Code §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory and unlawful conduct.

### AS A FOURTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

57.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

58.    New York City Administrative Code §8-107(13) Employer liability for discriminatory conduct by employee, agent or independent contractor.

    a.    An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

    b.    An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

        1.    the employee or agent exercised managerial or supervisory responsibility; or

        2.    the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

9

DFS0499

3.   the employer should have known of the employee's or agent's
discriminatory conduct and failed to exercise reasonable diligence to
prevent such discriminatory conduct.

c.   An employer shall be liable for an unlawful discriminatory practice committed by
a person employed as an independent contractor, other than an agent of such
employer, to carry out work in furtherance of the employer's business enterprise
only where such discriminatory conduct was committed in the course of such
employment and the employer had actual knowledge of and acquiesced in such
conduct.

59.   Defendant DFS violated the section cited herein.

## JURY DEMAND

60.   Plaintiff demands a trial by jury.

WHEREFORE, Plaintiff respectfully requests a judgment against the Defendants:

A.   Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII
of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et. seq., and the New York City
Human Rights Law in that Defendants sexually harassed Plaintiff and discriminated against
Plaintiff on the basis of her gender;

B.   Awarding damages to Plaintiff resulting from Defendants' unlawful sexual harassment and
discrimination and to otherwise make her whole for any losses suffered as a result of such
unlawful employment practices;

C.   Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress,
pain and suffering and injury to her reputation in an amount to be proven;

D.   Awarding Plaintiff punitive damages;

10

DFS0500

E. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the

action; and

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and

proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
February , 2015

PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC

By:  _____
Joshua P. Frank, Esq.
*Attorneys for Plaintiff*
45 Broadway, Suite 620
New York, New York 10006
(212) 248-7431
jfrank@tpglaws.com

11

DFS0501

Exhibit C

Page 1

1    UNITED STATES DISTRICT COURT

      SOUTHERN DISTRICT OF NEW YORK

2    ----------------------------------------------X

3    TIFFANY HSUEH,

4                       Plaintiff,

5                                    Index No:

        - against -            15 CV 03401

6

      THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES

7    a/k/a THE DEPARTMENT OF FINANCIAL SERVICES and

      ABRAHAM GUEVARA, Individually,

8

                        Defendants.

9

      ----------------------------------------------X

10

                      120 Broadway

11                    New York, New York

12                    April 20, 2016

                      10:16 a.m.

13

14

15

16

17

18       EXAMINATION BEFORE TRIAL OF TIFFANY HSUEH, the

19    Plaintiff, pursuant to Notice, taken at the above

20    place, date and time, before MARIA ACOCELLA, a

21    Notary Public within and for the State of New York.

22

23

24

25

Page 205

1                     T. Hsueh

2       Q.     Did she tell you that other

3    victims could be inhibited from coming

4    forward if sexual harassment allegations are

5    not kept confidential?

6                 MR. FRANK:   Objection, asked and

7          answered.

8       A.     I don't remember if she told me

9    that.  I just know she was inhibiting me from

10   speaking about my sexual harassment.

11      Q.     Did you ever record these

12   conversations with Ms. Clavery?

13      A.     No, I don't believe so.

14      Q.     You don't believe so, or do you

15   know?

16      A.     I don't think so.

17      Q.     Is it possible that you recorded

18   conversations with Ms. Clavery?

19      A.     It is possible.

20      Q.     Were you recording conversations

21   that you had with Ms. Clavery?

22      A.     I don't remember.  And like I

23   deleted and lost a bunch of stuff in my

24   files.  It has been two years.  I only found

25   my health insurance records yesterday.

Page 206

1                    T.  Hsueh

2     Otherwise I would have given them to Josh

3     before, so I might have recorded something.

4          Q.       And deleted it?

5          A.       Yes.

6          Q.       When would you have deleted it?

7          A.       Either the course of 2016 or

8     2015.

9          Q.       Why were you recording

10    conversations with Ms. Clavery?

11         A.       Because she had not taken -- she

12    had not taken -- I do not feel she was

13    responding appropriately to my harassment

14    complaints.

15         Q.       How were you taping your

16    conversations with her?

17         A.       Because it would show what

18    exactly she was saying her actions and -- but

19    everything she was telling me.  Like telling

20    me again to stay silent and be quiet.

21         Q.       Did you record those

22    conversations for purposes of this lawsuit?

23         A.       No.

24         Q.       So then why did you record them?

25         A.       To protect myself.

Page 207

```
 1                    T. Hsueh
 2       Q.      From what?
 3       A.      Retaliation.
 4       Q.      Retaliation by who?
 5       A.      Allison herself, DFS.
 6       Q.      Then why did you delete them?
 7       A.      Because I didn't -- because like
 8  I said, it was over the course of two years.
 9  I have moved in the meantime, and I lost -- I
10  have gotten a new computer.  I haven't kept
11  everything.
12       Q.      You kept photos.  You kept a
13  spreadsheet.
14               You didn't keep tape recorded
15  conversations with Ms. Clavery?
16               MR. FRANK:  Objection to form.
17       A.      As I said, the voice recording
18  itself is was not very clear, so I did not
19  feel it was worth keeping.
20       Q.      Did you delete it because it
21  wasn't helpful for your case?
22       A.      No.  Because I actually would
23  have rather it been more clear.  The only way
24  to do that would have been to held the tape
25  recorder right to her mouth.
```

Page 208

1                    T. Hsueh

2        Q.      You were recording Ms. Clavery

3   without her knowledge, right?

4        A.      I did not tell her I was

5   recording her.

6        Q.      Were you setting up these

7   meetings with Ms. Clavery so that you could

8   record her?

9        A.      No.

10       Q.      You were setting them up and just

11   happened to record her?

12       A.      I believe one of the meetings,

13   she reached out to me and asked me to meet

14   with her.  So it is not that it was all one

15   sided and I was asking her for those

16   meetings.

17       Q.      But some of them, you asked for?

18       A.      Yes.  I asked her for some

19   meetings.  And she, in return, also contacted

20   me to ask for meetings.

21       Q.      And how many meetings with

22   Ms. Clavery did you record?

23       A.      From my recollection, there was

24   only approximately two to three meetings.  So

25   I think I only recorded one meeting.

1                   T. Hsueh

2       Q.       And was that a meeting you had

3  initiated or she had initiated?

4       A.       She had initiated.

5       Q.       How do you remember that?  Which

6  meeting was it?

7       A.       I remember going to that meeting.

8       Q.       Which meeting are we talking

9  about now?

10      A.       It was the very last one she had

11  with me.

12      Q.       And you said she initiated that

13  one?

14      A.       Yes.

15      Q.       For what purpose?

16      A.       She asked me, what would you like

17  me to do.

18      Q.       When was this meeting?

19      A.       I believe it was sometime in

20  either December or January.

21      Q.       Of 2015?

22      A.       Yes, 2015 or 2016.

23      Q.       So she called the meeting to ask

24  what you wanted her to do.

25                Can you explain what you mean by

Page 210

1                        T. Hsueh

2    that?

3         A.      I asked her -- I was very upset.

4    I told her I felt I was being left in the

5    dark.   That I wasn't being given any status

6    updates.   I hadn't been told that Abe Guevara

7    had been placed on administrative.   I hadn't

8    even been told the exact date of his

9    retirement.

10               They never -- they have not

11   notified DFS employees not to allow him back

12   in the building.   They did not notify them

13   that he was a physical danger to me.   And I

14   asked her about all these things.

15        Q.      And what did she say?

16        A.      She said what would you like me

17   to do.

18        Q.      And what did you say?

19        A.      I don't remember exactly, but I

20   remember staring at her in disbelief, why she

21   would ask me how to tell her to do her job.

22        Q.      And again, you recorded this

23   meeting, correct?

24        A.      Yes.

25        Q.      And deleted that recording?

Page 211

1                          T. Hsueh

2        A.      As I said before, it was not very

3    clear.

4        Q.      So you listened to it after?

5        A.      Yes.

6        Q.      To make sure you caught

7    everything?

8        A.      I don't -- I didn't listen to the

9    whole thing.  I listened to the first few

10   minutes, and I had not even been able to

11   catch most of her responses.

12       Q.      Other than Ms. Clavery, did you

13   discuss your complaints against Mr. Guevara

14   with anyone else at DFS?

15       A.      Um, I don't remember.

16               I know, you know, definitely it

17   was Jenny.  I talked to Mark.

18       Q.      That is Mark Allen?

19       A.      Yes.

20       Q.      Anyone else?

21               Well, actually, what did talk to

22   Mr. Allen about?

23       A.      That Abe had been -- had been --

24   had forced a kiss on me.

25       Q.      No.  I am talking now about your

Exhibit D

Page 1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ---------------------------------------------X
3   TIFFANY HSUEH,
4                      Plaintiff,
5                                   Index No:
        - against -            15 CV 03401
6
    THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES
7   a/k/a THE DEPARTMENT OF FINANCIAL SERVICES and
    ABRAHAM GUEVARA, Individually,
8
                       Defendants.
9
    ---------------------------------------------X
10
                       120 Broadway
11                     New York, New York
12                     April 20, 2016
                       10:16 a.m.
13
14
15
16
17
18       EXAMINATION BEFORE TRIAL OF TIFFANY HSUEH, the
19   Plaintiff, pursuant to Notice, taken at the above
20   place, date and time, before MARIA ACOCELLA, a
21   Notary Public within and for the State of New York.
22
23
24
25

Page 123

1                         T. Hsueh

2          Q.       When did you fill out the

3    complaint form?

4          A.       Well, she gave it to me, and I

5    believe I filled it out the following day.    I

6    am not exactly sure.

7          Q.       And during your meeting with

8    Ms. Clavery, what did you tell her was going

9    on with Mr. Guevara?

10                  I am going to ask you to stop

11    doing that.

12                  What did you tell her at the

13    meeting?

14          A.       All the list of instances that

15    happened, I had written out.

16          Q.       So you read her that list or

17    showed her the list?

18          A.       I don't know exactly.  But I

19    believe I showed her the list and I read from

20    it.

21          Q.       What was her response?

22          A.       She said she was taking it very

23    seriously.  But in the meantime, she was

24    going to investigate it.  But in the

25    meantime, I couldn't tell anyone.  She told

```
 1                    T. Hsueh
 2   me -- she instructed me not to talk to anyone
 3   in the department about this, just to stay
 4   quiet.  Just stay quiet and, you know, let
 5   her do the investigation.
 6         Q.      Did she explain that the
 7   investigation was going to be confidential?
 8         A.      Confidential only to me or --
 9         Q.      Did she explain it was going to
10   be a confidential investigation?
11         A.      Okay.  Because when I hear
12   confidential, I think maybe lawyer privilege
13   confidential, and it is just me only.
14                 It wasn't just me.  She was going
15   around, talking to several other employees.
16         Q.      Right.
17         A.      Talking about this.
18         Q.      Yes.  People that you identified
19   in your complaint?
20         A.      Yes, so...
21         Q.      Did she tell you that the
22   investigation that -- when she told you not
23   to discuss the investigation, did she explain
24   that it was because it was a confidential
25   investigation?
```

Page 125

1                    T.  Hsueh
2        A.      She  just  told  me  to  be  quiet.
3   She  just  told  me  --  yeah,  she  just  said  --
4   she  might  have  said  it  was  confidential.   She
5   just  instructed  me,  from  what  I  --  my
6   strongest  memory  is  that  she  was  instructing
7   me  to  be  quiet.   Just  to  stay  silent,  not  to
8   talk  to  anyone,  and  to  let  her  collect
9   information  from  others.
10       Q.      And  she  also  provided  you  with
11  that  complaint  form  to  fill  out?
12       A.      Yes.
13       Q.      Where  did  you  fill  it  out,  at
14  home  or  at  work?
15       A.      I  don't  know  exactly.   But  I
16  believe  that  I  filled  it  out,  you  know,  right
17  after  I  met  her.
18       Q.      Okay.
19       A.      Or  I  started  filling  it  out.
20       Q.      And  you  said  you  already  had  that
21  spreadsheet  prepared  already,  correct?
22       A.      Yes.
23       Q.      And  then  when  did  you  submit  the
24  completed  form  with  the  attachment  to
25  Ms.  Clavery?

Page 126

1                     T. Hsueh

2          A.      I don't know exactly, but I think

3    it was the very next day.

4          Q.      The day after your first meeting?

5          A.      Either the day after or

6    another -- the day right after the meeting.

7          Q.      So a day or two after your

8    meeting?

9          A.      Yes, a day or two after.

10         Q.      If you can turn to page two of

11   the complaint, the handwritten portion still.

12   Yeah, page two.   Number three, the second

13   question is the discrimination continuing.

14   Do you see that?

15         A.      Oh, yes.   Is the discrimination

16   continuing.   Yes, I have checked box next to

17   yes.

18         Q.      Now if we go to the text you said

19   you started keeping -- okay.   After the

20   handwritten pages we have these two pages of

21   a spreadsheet.   Right?

22         A.      Uh-huh.

23         Q.      And you said you started keeping

24   the spreadsheet on or after July 3rd, right?

25         A.      Yes.   Yes, I did.

Page 127

1                     T. Hsueh

2       Q.      And where did you type them?  Was

3  that at home or at work?

4       A.      I believe while the incidents

5  were occurring, so probably at work.

6       Q.      So you typed that at work.

7               Did you anyone help you prepare

8  them?

9       A.      No.

10      Q.      Did you show them to anyone aside

11  from Ms. Clavery?

12      A.      I don't believe I showed it to

13  anyone.

14      Q.      Did you see them to your husband?

15      A.      To my husband, yeah, I probably

16  might have shown it to him.

17      Q.      Do you recall when?

18      A.      I see my husband every day.  It

19  could have been even the day I created the

20  spreadsheet.  It could have been while it was

21  ongoing.

22      Q.      You said you were preparing it at

23  work, right?

24      A.      Yeah.  I also e-mailed it to

25  myself, and I probably added on to more stuff

Page 128

1                    T. Hsueh
2  and instances that occurred even before the
3  July 3rd incident.  So I could have shown it
4  to my husband.
5       Q.     What did he say when you showed
6  it to him?
7            MR. FRANK:  Just answer her
8       question.
9       A.     What did he say?
10      Q.     Yes.
11      A.     He said it was creepy.
12      Q.     When you showed him these pages,
13  was that the first time you had spoken to
14  your husband about Mr. Guevara?
15      A.     No.
16      Q.     When was the first time?
17      A.     While I had known Mr. Guevara
18  since I entered the property bureau.  I might
19  have mentioned him on and off since 2012.
20      Q.     When was the first time you told
21  your husband that you were having a problem
22  with Mr. Guevara?
23      A.     I can't be sure of the exact
24  date.  We are married.  We see each other
25  every day.  We have been together a long

1                    T. Hsueh

2    time.   So I could have mentioned it anywhere

3    from 2012 onwards.

4        Q.     And what was your husband's

5    response?

6        A.     He said it was creepy, and that

7    Mr. Guevara should have known better.

8        Q.     Now does this spreadsheet contain

9    a summary of all your encounters with

10   Mr. Guevara?

11              MR. FRANK:  Objection to form.

12              You can answer.

13       A.     Actually, I think I added even

14   more after 30.  So it might even extend past

15   30.

16       Q.     On the day that you submitted

17   this complaint to Ms. Clavery, was this a

18   complete summary of your interactions with

19   Mr. Guevara?

20              MR. FRANK:  Objection to form.

21              You can answer.

22       A.     Yes, I believe so.

23       Q.     So did you leave anything out?

24              MR. FRANK:  Same objection.

25       A.     There is just so much.   There is

Page 131

1                          T. Hsueh

2          Q.        And what did he say?

3          A.        He said oh, he is like, take it.

4     Take it.  You know, I am not going to use it.

5     You might as well have it.

6          Q.        So you accepted them, correct?

7          A.        Not with any intention to use

8     them.

9          Q.        But you kept them?

10         A.        It seemed rude to offend him, and

11    he seemed to really want me to keep them.

12         Q.        Why didn't you throw them out

13    once you accepted them?

14         A.        Why didn't I throw them out?

15         Q.        Yes.

16         A.        I just stashed them in the bottom

17    part of my office drawer and never looked at

18    them again, actually.

19                   And you are correct but, you

20    know, I don't know.  Maybe I thought that I

21    could, yeah, I would take photographs of them

22    later as proof.

23         Q.        So you kept them because you

24    thought you might need proof later?

25         A.        Well, I didn't keep them

1                        T.  Hsueh

2    this girl?

3         A.        I haven't put a date here, so I

4    can't be exactly to sure.   But when I was

5    actually -- I think it was sometime after the

6    July 3rd incident when I actually told her

7    that I was thinking of filing -- making an

8    official complaint.

9         Q.        Now if you turn to the next -- to

10   the pages after this spreadsheet, the first

11   few pages are photos of the call log on your

12   work phone; is that right?

13        A.        Uh-huh.

14        Q.        And does your work phone reflect

15   incoming and outgoing calls?

16        A.        I think this is all calls, so it

17   should be incoming and outgoing.

18        Q.        I am not saying this.

19                  I am saying your work phone, in

20   general, does it reflect both types of

21   calling?

22        A.        Yes.

23        Q.        Now at the top of that first page

24   you say they reflect 14 calls made from

25   May 23rd to July 7th, period of three months,

```
 1                   T. Hsueh
 2   right?
 3        A.       Uh-huh.
 4        Q.       New these 14 calls are not the
 5   only calls you received during that
 6   three-month period, are they?
 7        A.       No.  Those are the only ones that
 8   I guess are still left on my phone.
 9        Q.       I am asking from for Mr. Guevara.
10             During this three-month period,
11   you did not only receive or make 14 calls,
12   right, or make 14 calls?
13             MR. FRANK:  Objection to form.
14             Go ahead.
15        Q.       That was a convoluted question.
16             Now these first few pages, they
17   reflect calls over a three-month period,
18   right?
19        A.       Yes.
20        Q.       Now over that three-month period,
21   you did not only get these 14 calls, right?
22   I am not saying Mr. Guevara, period.
23             Other people called you during
24   this three-month period on your work phone?
25        A.       I am actually not too sure.  Any
```

Page 148

T. Hsueh

1
2  saying?  No one ever called you?
3     A.     From my understanding, you are
4  asking me for the period of three months, who
5  called me?
6     Q.     Yes.
7     A.     I am saying other people might
8  have called me.  But from just going by what
9  I am showing you.
10    Q.     Did you delete any calls?  Before
11 you took these pictures, did you delete any
12 calls that were not from Mr. Guevara?
13    A.     It has been two years, so I am
14 not exactly clear.  But I might have deleted
15 any other calls that would not show the
16 sexual harassment.
17    Q.     So why would you have deleted
18 those calls?
19    A.     I guess to show -- some that Abe
20 was actually calling me on those times and
21 dates.
22    Q.     So you would have deleted any
23 calls that were not from Mr. Guevara?
24    A.     I can't be too sure.  I might not
25 have received any.  I can go months without

Page 153

```
 1                  T. Hsueh
 2   call log, then we have pictures of an
 3   escalator, then we have pictures of a
 4   necklace, a hair clip and two baseball caps,
 5   right?
 6        A.     Yes.
 7        Q.     You say these are gifts that
 8   Mr. Guevara gave you, right?
 9        A.     Yes.
10        Q.     Now did he give them to you all
11   at once?
12        A.     No.
13        Q.     It was on separate occasions?
14        A.     Yes.
15        Q.     Over the course of how many
16   years?
17        A.     I believe over the two years that
18   I knew him.
19        Q.     And then when did you take these
20   pictures?
21        A.     When did I take these pictures?
22   I believe it was the same time I was
23   recording, possibly on or after July 3rd.
24        Q.     And why did you take pictures at
25   that point?
```

Page 154

1                    T. Hsueh

2        A.       Because I realized, you know, he

3    had crossed the line.  He had tried to kiss

4    me, and he was pressing himself again me.

5    And that was -- I realized he wanted to go

6    further.  He wanted to go further.  He wanted

7    a further relationship, which was not

8    appropriate at all.

9        Q.       And then you -- after that

10   happened, you immediately recalled that you

11   had all these gifts and took their pictures?

12       A.       I believe I was asked like some

13   of my -- I mean, I believe I might have asked

14   if I had any gifts.

15       Q.       By who?

16       A.       Possibly Jenny.  I believe I was

17   asked if I had gifts, and all I could think

18   of was -- I don't even really recall.  I

19   don't really consider these -- these aren't

20   stuff that I use every day, or even to my

21   style or taste, so like I couldn't even

22   recall what they were.  And then I looked

23   into my drawer, and I found them.

24       Q.       So why did Jenny ask if you had

25   any gifts?

Page 155

1                       T. Hsueh

2        A.      I can't recall the context.   But

3   yeah, I was asked.   I was telling her that I

4   was afraid.   I was afraid and that, you know,

5   that this was definite sexual harassment.

6               And she asked -- I think she

7   might have asked me if I had been given any

8   gifts.

9        Q.      And then where had you been

10  keeping these gifts?

11       A.      In the bottom of my drawer.

12       Q.      At work?

13       A.      Yes.

14       Q.      For some of them for a year or

15  two?

16       A.      Possibly, yes.

17       Q.      And why, again, did you not throw

18  them out?

19       A.      Why did I what?

20       Q.      Why didn't you throw them out, if

21  you didn't want them?

22               MR. FRANK:   Objection, asked and

23       answered.

24       A.      I wasn't going to use them, and I

25  had extra space in the bottom of my drawer.

Page 162

                        T. Hsueh
1
2    on leave?
3         A.       No.  I had not heard that.  I was
4    not actually informed of anything.
5         Q.       Did you hear from anyone that he
6    had been placed on leave?
7         A.       No.  I was not informed of
8    anything.
9         Q.       I am not asking if you were
10   informed of anything.
11                 MR. FRANK:  Objection, asked and
12        answered.
13        Q.       Did anyone, at any point, tell
14   you that Mr. Guevara had been placed on
15   leave?
16                 MS. FRANK:  Objection, asked and
17        answered.
18        A.       Allison had a very heavy
19   emphasizing the fact that I stay quiet.  I
20   believe she gave the same instructions to
21   Mark and Jody.  So I was not even -- and
22   every time I e-mailed Allison Clavery for an
23   update, she would not tell me anything.  She
24   would tell me the investigation was ongoing.
25   She would not give me any information.

Page 163

1                    T. Hsueh

2        Q.      Ms. Hsueh, I would ask for you to

3    please answer the questions that I am asking.

4    I know you have a story to tell.  I am sure

5    we will get to it, but please answer my

6    questions.

7        A.      I am trying to answer you.  You

8    asked me if anyone informed me, and I told

9    you no one informed me of anything.

10       Q.      Okay.

11               Did you hear that Mr. Guevara had

12   been escorted out of the office?

13       A.      No.

14       Q.      That happened in front of

15   everyone in the property bureau, didn't it?

16       A.      I was not even told about it.

17   Like from my cubicle to where the front door

18   is, actually I wouldn't be able to see the

19   front door.

20       Q.      It is a fair unusual occurrence

21   for someone to be escorted out of the

22   property bureau, isn't it?

23       A.      I am not sure.

24       Q.      Was it the talk of the office?

25       A.      I wasn't even there that long.

Page 164

T. Hsueh

1      Q.      Was it the talk of the office

2  that Mr. Guevara had been escorted out of the

3  property bureau?

4      A.      I can't emphasize how Allison

5  Clavery told me to be quiet, and she

6  instructed everyone around me the same order,

7  to stay silent, be quiet, not to talk to each

8  other.

9      Q.      So it is your testimony that

10  people were not discussing the fact that

11  Mr. Guevara had been escorted from the

12  building?

13      A.      If they were discussing it, it

14  was never to my face and never within my

15  hearing.

16      Q.      Weren't people asking where he

17  had gone?

18          MR. FRANK:   Objection to form.

19      A.      They certainly weren't asking me

20  where he had gone.

21      Q.      But you saw he was no longer at

22  work, right?

23      A.      As I repeated, I was never

24  informed of anything.

Page 172

```
 1                    T.  Hsueh
 2   e-mail  correspondence  marked  as  Exhibit  G?
 3        A.      Yes.
 4        Q.      And  this  is  an  e-mail
 5   correspondence  again  between  you  and  Allison
 6   Clavery,  right?
 7        A.      Yes.
 8        Q.      In  the  first  e-mail  from  you  is
 9   dated  September  2nd,  right,  2014?
10        A.      Yes.
11        Q.      And  that  is  about  two  weeks  after
12   you  filed  your  complaint,  right?
13        A.      Yes.
14        Q.      And  you  asked  Ms.  Clavery  for  the
15   results  of  your  case,  and  say,  I  am  anxious
16   for  a  conclusion  to  relieve  my  unease,  right?
17        A.      Yes.
18        Q.      What  were  you  uneasy  about?
19        A.      As  I  mentioned  earlier,  she  had
20   told  me  to  be  quiet.   She  informed  my
21   supervisors  to  be  quiet,  not  to  say  anything.
22   She  informed  me  not  to  say  anything.
23            My  supervisors  were  not  telling
24   me  anything.   I  was  not  hearing  anything  from
25   other  employees.   I  was  entirely  in  the  dark
```

Page 188

```
 1                    T.  Hsueh
 2  a collection was going on.
 3       Q.      What did she say?
 4       A.      She said she can't tell other
 5  people what to do.
 6       Q.      And why were you upset about this
 7  collection?
 8       A.      Because there had been nasty
 9  gossip going around behind my back.  I had
10  encouraged Abe, and I had intentionally tried
11  to seduce him and that, you know, they blamed
12  me and, you know.  That Abe had been an
13  innocent old man, and no other girl had
14  complained about him before, and they had
15  known him for such a long time.  I felt
16  victimized all over again.
17       Q.      Other than contacting Allison,
18  did you do anything else when you found out
19  about the collection?
20              MR.  FRANK:  Objection to form.
21              Go ahead.
22       A.      During my conversation with
23  Allison, and she again reiterated that I had
24  to stay silent, not to speak to anyone.
25       Q.      Ms. Hsueh, I said other than your
```

1                   T. Hsueh

2    meeting with Allison.  I don't know why you

3    are responding to me with a question with

4    testimony about Allison's meeting.

5         A.      I am trying to answer your

6    question by telling you what Allison was

7    instructing me to do.

8         Q.      What did she instruct you to do?

9         A.      Not talk about this

10   investigation.  To be quiet, and that if I

11   stayed silent, everything would die down.

12        Q.      Did you follow those

13   instructions?

14        A.      I had followed the instructions

15   up until that point where she had told me

16   that she couldn't tell people what to do, and

17   that is all she wanted me to do.

18               All she wanted for this

19   investigation was for it to die down.

20        Q.      So you disregarded her

21   instructions.  What did you do?

22        A.      As I mentioned earlier, I

23   followed her instructions up until the point

24   where I felt that she was no longer looking

25   out for my best interest.  And she was

Page 198

1                    T. Hsueh
2     exact date.
3               You knew about a retirement
4     collection, therefore you knew he was
5     retiring, right?
6               MS. FRANK:  She said yes.
7               MS. DIETZ:  No, she didn't.
8               MR. FRANK:  I think the record
9          will show.
10         Q.    You knew about a retirement
11    collection, so you knew he was retiring; is
12    that correct?  Yes or no?
13         A.    Yes.  But I was not told an exact
14    date.  He could have been retiring a month
15    from that date.
16         Q.    And what did you tell Ms. Clavery
17    that you wanted to know?
18         A.    I wanted a status update on the
19    investigation.
20         Q.    And what was her response?
21         A.    She said -- she again said the
22    complaint was being investigated.  And while
23    the investigation was ongoing, don't speak to
24    anyone about it.  Don't speak about it with
25    Jenny.  Don't speak about it with your

```
 1                    T. Hsueh
 2   supervisors.  Don't speak about it, period.
 3   Everything will die down.
 4        Q.     She specifically said, don't
 5   speak about it with Jenny?
 6        A.     Yes.
 7        Q.     Why would she say that?
 8               MR. FRANK:  Objection, calls for
 9        speculation.
10               Go ahead.
11               MS. DIETZ:  I am going to ask
12        again that you don't give speaking
13        objections.  Objection to form, and that
14        is it.  You know that is all you are
15        supposed to today.
16        A.     She had seen Jenny escort me to
17   when I filed the complaint, and she
18   interviewed Jenny; so she knew about Jenny.
19        Q.     Well, in your complaint, you said
20   she said keep quiet, right?
21        A.     (Witness indicating)
22        Q.     Is that a yes?
23        A.     Stay silent, actually.
24        Q.     So she said stay silent?
25        A.     Yes.
```

Page 200

1                        T. Hsueh
2        Q.       And you say in your complaint she
3    said, well, you say keep quiet, and you say
4    she said that approximately a dozen times?
5        A.       Yes.
6        Q.       Was it keep quiet, or is it stay
7    silent, that she said approximately a dozen
8    times?
9        A.       I did not record her that day, so
10   I cannot say her exact words.  It was pretty
11   much stay silent.  Be quiet.  Everything will
12   die down.
13       Q.       And you recall she said that
14   approximately a dozen times?
15       A.       Yes.
16       Q.       In how many conversations?
17       A.       As I said, I think -- I believe I
18   had two or three meetings with her, and it
19   was throughout the course of the two or three
20   meetings.
21       Q.       She would just keep repeating
22   stay quiet, stay quiet?
23       A.       Yes.
24       Q.       Didn't she simply tell you the
25   investigation was being kept confidential?

Page 201

1                        T.  Hsueh

2        A.      She said -- I don't remember -- I

3   don't remember word for word everything she

4   told me.

5              And the strongest point, from my

6   memory, is what really stuck out for me was

7   the fact that she kept saying, stay quiet,

8   stay quiet, be silent, be silent.  If you

9   stay silent, everything will die down.

10  People just want gossip.

11       Q.      Did you have a problem with the

12  fact that the investigation was confidential?

13       A.      For me, yes, I did.

14       Q.      Not confidential, in general?

15       A.      Because she was not informing me

16  of anything.

17       Q.      You said she kept saying keep

18  quiet, stay quiet, whatever.

19              What did you want to say, and to

20  whom?

21       A.      She was telling me not to talk at

22  all about my sexual harassment.

23       Q.      To who?

24       A.      I am assuming she meant everyone.

25  Or like that is what I can inferred.

Page 202

1                    T. Hsueh

2      Q.      Who did you want to talk about it

3  with?

4      A.      Not necessarily that I wanted to

5  talk about it.  If anyone had asked me, I

6  would have probably would have responded.

7  But before I could even get to that point she

8  just said stay silent, be quiet.

9      Q.      And your problem with that was in

10 case someone happened to ask you if you had

11 been sexually harassed, you wanted to be able

12 to say yes?

13     A.      No.  If, you know, like, for

14 example, when they collected the money,

15 anyone had asked me about it, I would have

16 liked -- I would have appreciated being able

17 to tell people what Abe had done to me.  And

18 instead, I wasn't.

19     Q.      So that was what you wanted to

20 do, you wanted to be able to tell people your

21 allegations against Mr. Guevara, when they

22 were collecting money for his retirement?

23     A.      They are not allegations.  It was

24 even found by Allison Clavery --

25     Q.      Not at that time.

Page 226

1                        T. Hsueh
2    blame yourself.
3         Q.      Why did you talk to both of them?
4         A.      I felt very isolated, after
5    Allison told me I couldn't speak to anyone.
6    So my supervisor had been told instructed not
7    to say anything.  She told me not to speak to
8    Jenny.  And I needed -- I went to look for --
9    I was looking for advice.
10        Q.      Well, you were still
11   communicating with Jenny.  We have just seen
12   all these e-mails?
13        A.      Yes.  But she instructed me not
14   to.
15        Q.      But you did anyway; is that
16   correct?  You talked to her anyway?
17        A.      I stopped talking until the point
18   of the money collection, and in which case I
19   resumed talking to Jenny.
20        Q.      And now you said your supervisors
21   were told not to talk to you.
22                How do you know your supervisors
23   were told not to talk?
24        A.      Allison said that -- Allison
25   said -- Allison told me to be quiet.  And I

Page 238

```
 1                     T. Hsueh
 2        A.      Yes.
 3                MS. DIETZ:  I would like to mark
 4        the next exhibit.
 5                (Whereupon, a four-page document
 6        was received and marked as Defendant's
 7        Exhibit K for identification, as of this
 8        date.)
 9        Q.      Before we get to that, have you
10   tape recorded any conversations with anyone
11   else at DFS, other than Ms. Clavery?
12        A.      No.
13        Q.      Now we can look at -- do you
14   recognize Exhibit K?
15        A.      It looks like my spreadsheet.
16        Q.      Well, it is similar to the
17   spreadsheet that was attached to your
18   internal complaint, but it is longer, right?
19        A.      Yes.
20        Q.      When did you prepare this
21   document?
22        A.      It is the same spreadsheet.  I
23   just added onto it.
24        Q.      So you started preparing it in
25   July 2014.  And when was the last time you
```

Page 239

```
 1                      T. Hsueh
 2   put an entry in there?
 3        A.       December or January.
 4        Q.       Of what year?
 5        A.       December of 2014 or January 2015.
 6        Q.       Now why did you keep adding to
 7   this spreadsheet?
 8        A.       I was told it is good practice.
 9        Q.       You were told by who?
10        A.       Multiple people.
11        Q.       Who told you it was good
12   practice?
13        A.       Jenny.
14        Q.       Jenny told you it was good
15   practice.
16                 Did she tell you to keep adding
17   to it after you had filed your internal
18   complaint?
19        A.       She did not tell me to keep
20   adding to it.  Since I already started, I saw
21   no reason not to continue.
22        Q.       Why did you stop adding to it in
23   December 2014 or January 2015?
24        A.       Because HR clearly -- HR clearly
25   was not giving me the results of my
```

Page 268

```
 1                    T. Hsueh
 2  on to it.
 3        Q.     And you have said that you
 4  continued adding on to it through
 5  December 2014, January 2015, right?
 6        A.     Yes.
 7        Q.     That is around the time you
 8  decided to file a lawsuit, right?
 9        A.     Yes.
10        Q.     When did you hire an attorney?
11        A.     I don't remember the exact date,
12  if it is December 2014 or January 2015.
13        Q.     And why did you file this
14  lawsuit?
15               MR. FRANK:  Objection to form.
16        A.     As I said, was scared.  I was
17  scared and frightened.  And HR wasn't doing
18  anything to notify employees that he was not
19  allowed back into the building.  He was seen
20  multiple times.  I was asking Allison quite
21  a -- for quite a few updates, and she was not
22  telling me anything.
23               Finally Scott Gollop said he
24  would tell me the final results of my sexual
25  harassment case.  And then it just seemed
```

Page 283

```
 1                         T.  Hsueh
 2    technically  arrested.
 3         Q.      Wasn't  your  lawsuit  back  in  2011
 4    for  false  arrest?
 5         A.      That  is  why  I  had  said  I  had  been
 6    handcuffed.   I  had  taken  to  a  jail  cell  and
 7    held  for  90  minutes,  and  I  had  thought  I  had
 8    been  arrested.
 9         Q.      But  you  still  didn't  disclose
10    that  to  Ms.  Burra?
11         A.      You  know,  if  she  had  just
12    outright  asked,  and  from  the  conflicting
13    information  my  lawyer  had  given,  I  was  not
14    truly  processed  as  an  arrest,  I  might  have
15    truthfully  answered  no,  I  was  not  arrested.
16         Q.      During  your  sessions  with
17    Ms.  Burra  did  you  tell  her  that  Mr.  Guevara
18    had  left  you  numerous  voicemail  messages?
19         A.      I  don't  remember  every  single
20    detail,  but  I  mentioned  that  he  made  multiple
21    phone  calls  and  that  I  did  have  a  voicemail
22    message  from  him.
23         Q.      Did  he  leave  you  numerous
24    voicemail  messages?
25         A.      He  had  left  me  that  voicemail.   I
```

Page 284

1                  T. Hsueh

2    gave it to my lawyer.  I am sure Josh had

3    provided it to you.  And Mark Allen had also

4    heard it.

5        Q.    Is that the only voicemail

6    message Mr. Guevara ever left you?

7        A.    I don't remember.  It is the only

8    one I had saved.

9        Q.    So it is possible he left you

10   others, and you only saved this one?

11       A.    As I said, yeah, he mostly called

12   me, and I documented my calls.

13       Q.    Did he leave you more than one

14   voicemail message?

15       A.    He might have left me more than

16   one voicemail message.  That is the only one

17   I saved.

18       Q.    Why would you have only saved

19   that one, if he left you more?

20       A.    I was in the process of -- I

21   routinely clean -- I am sure everybody

22   routinely cleans their voicemail messages.

23       Q.    Then why would you have saved

24   one?

25       A.    That is the one where it was

Page 285

1                    T.  Hsueh

2  after the July 3rd incident, where he had

3  forced a kiss upon me.  And I had been truly,

4  truly frightened for my physical safety, and

5  that I would have to -- to involve my

6  supervisor.

7       Q.    Did you delete any voicemail

8  messages that Mr. Guevara left you?

9       A.    I don't remember.  Like I said, I

10  have been employed since 2010.  I routinely

11  clean my voicemail messages.  It is very

12  possible I could have deleted previous

13  voicemail messages from Mr. Guevara.

14       Q.    During your sessions with

15  Ms. Burra did you tell her that Mr. Guevara

16  sent you numerous text messages?

17       A.    He didn't have my phone number.

18       Q.    So he did not send you text

19  messages?

20       A.    No.

21       Q.    And during these sessions, did

22  you tell Ms. Burra that none of your

23  colleagues were supporting you?

24       A.    As I mention earlier, I felt very

25  isolated from my colleagues.  I had been

Page 324

1                          T. Hsueh

2  no, because I said it is possible I might

3  have mentioned it.

4          Q.      Did Mr. Guevara send a lot of

5  chain e-mails at work?

6          A.      It was -- I would say like maybe

7  once a month or so.

8          Q.      Once a month since 2012, when you

9  first met him?

10         A.      No, not from 2012.  I mean, I

11 don't have all of dates of the chain letters,

12 so I might not -- the earliest I had taken a

13 screen shot of was from 2013.  So it is

14 possible that he might have given me chain

15 letters from before 2013 and I had not saved

16 it.

17         Q.      Do you still have that screen

18 shot?

19         A.      Yes.

20         Q.      Do you recall what the chain mail

21 said?

22         A.      I gave them all to Josh.  I think

23 he gave copies of it to you.

24                 So they were just -- I think one

25 of them says which brain food is the best for

Page 325

1                    T. Hsueh

2   you.  One of them may have told his wife to

3   buy a cartoon of milk, and if there are

4   avocados, get six, and the husband comes home

5   with six cartoons of milk.

6        Q.     And are these the documents that

7   you produced today for your attorney?

8        A.     Yes.

9        Q.     Since you discussed them, we are

10  going to mark them.  We mark the entire

11  packet.

12             MR. RIZZO:  Let's mark this as

13        Exhibit Defendant's M.

14             (Whereupon, a multipage document

15        was received and marked as Defendant's

16        Exhibit M for identification, as of this

17        date.)

18        Q.     So, Ms. Hsueh, we have just

19  marked as Defendant's Exhibit M, 13 pages of

20  what appear to be screen shots from a

21  computer.

22        A.     Uh-huh.

23        Q.     That were produced this morning

24  by your counsel.

25        A.     Uh-huh.

1                       T.  Hsueh

2          Q.      I am going to ask you to take a

3     look at this and ask if you recognize that

4     document, or those 13 pages?

5          A.      Yes.

6          Q.      Do you recognize them?

7          A.      Yes, I recognize them.

8          Q.      And are these screen shots what

9     you referred to as the chain letters that Abe

10    would send around?

11         A.      Yes.

12         Q.      Do you recall if any one of these

13    13 pages is the particular screen shot of the

14    chain mail that you discussed with your

15    husband?  You can look at them if you would

16    like.

17         A.      I believe it was this one.

18         Q.      Which one?  The very first one

19    that has the exhibit mark on it?

20         A.      Yes.

21         Q.      And why do you recall it was this

22    one?

23         A.      Because I remember thinking it

24    was particular funny.  It was particularly

25    funny that, you know, it was a husband being

Page 329

1                   T.  Hsueh
2    the  incident  on  July  3rd,  I  was  advised  to
3    document  my  --  my  experiences  and  any
4    instances  with  Abe.   And  then  I  started
5    searching  my  e-mails,  and  I  took  a  few  --  I
6    believe  I  took  those  screen  shots  at  the  same
7    time.
8         Q.      So  other  than  being  told  to
9    document  for  purposes  of  the  incidents  that
10   occurred,  as  you  allege  them,  with
11   Mr.  Guevara,  was  there  any  other  reasons  for
12   saving  these  screen  shots?
13        A.      No.   You  know,  just  as  proof.
14        Q.      Proof  of?
15        A.      You  know,  I  had  gone  to  my
16   supervisors,  Mark  Wald  [sic],  if  I  ever
17   needed  --  if  I  ever  needed  more
18   documentation,  I  would  have  produced  those.
19        Q.      And  what  do  you  think  this  is
20   proof  of?
21        A.      I  supposed  e-mail,  communications
22   between  me  and  Abe  Guevara.
23        Q.      Okay.   Anything  else?
24        A.      No,  nothing  else.
25                Oh,  and  I  would  like  to  make  it