UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TIFFANY HSUEH,

Plaintiff,

No. 15-cv-03401 (PAC)

-against-

THE NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES a/k/a THE DEPARTMENT
OF FINANCIAL SERVICES and ABRAHAM
GUEVARA, *Individually*,

Defendants.

## SUPPLEMENTAL DECLARATION OF EVA L. DIETZ

EVA L. DIETZ hereby declares as follows:

1.      I am an Assistant Attorney General in the Office of New York State Attorney

General Eric T. Schneiderman, counsel for defendant New York State Department of Financial

Services ("DFS") in this action, and am admitted to practice before this Court.  I make this

supplemental declaration in further support of DFS's motion for spoliation sanctions against

plaintiff Tiffany Hsueh ("the Spoliation Motion").

**Procedural History**

2.      As described in the materials previously submitted in support of the Spoliation

Motion, plaintiff revealed at her deposition, held on April 20-21, 2016, that she had made and

then deleted a secret recording of at least one of her meetings with DFS employee Allison

Clavery.  See Docket Nos. 44-46.

3.      After learning of the existence and deletion of this recording, I repeatedly asked

Plaintiff's attorney, Joshua Frank, Esq., to determine if the recording could be recovered.  See

Emails attached hereto as Exhibit 1.  Mr. Frank failed to respond to my email queries and, when

we finally spoke on the phone, said he did not know if the recording could be recovered.

      4.      Accordingly, on May 6, 2016, I submitted a letter to the Court requesting a conference regarding DFS's proposed motion for spoliation sanctions against plaintiff as a result of the deletion of the recording. <u>See</u> Docket No. 37. Plaintiff failed to submit any response to my letter.

      5.      The Court held a conference on May 10, 2016 at which various discovery-related issues, including DFS's proposed motion for spoliation sanctions, were discussed. <u>See</u> Excerpts from Transcript of May 10 Conference, attached hereto as Exhibit 2. During the conference, Mr. Frank acknowledged and did not dispute that plaintiff had deleted the recording at issue. <u>Id.</u> at 21:19 – 23:9.

      6.      The Court therefore determined that DFS's proposed motion for spoliation sanctions was appropriate, <u>id.</u> at 23:6-7, and established a briefing schedule. <u>See</u> Docket No. 41.

      7.      DFS filed its Spoliation Motion as scheduled on June 13, 2016. <u>See</u> Docket Nos. 44-46. Defendant Abraham Guevara ("Guevara") joined in the motion on July 8, 2016. <u>See</u> Docket Nos. 51-52.

      8.      Plaintiff's opposition papers, if any, were due on Monday, July 11, 2016. <u>See</u> Docket No. 41. On that date, instead of submitting an opposition, Mr. Frank filed a letter stating that plaintiff had recovered the recording the previous evening with the help of her husband. <u>See</u> Docket No. 53. Mr. Frank further noted that "the draft opposition I have been working on obviously assumed the recording could not be recovered." <u>Id.</u>

      9.      I filed a response to the letter a few hours later. <u>See</u> Docket No. 54. I noted that the newly-recovered recording produced by plaintiff was incomplete and therefore did not moot the relief requested in DFS's Spoliation Motion. <u>Id.</u> I also asked the Court to reopen discovery

regarding the circumstances surrounding plaintiff's recovery of the recording (as well as regarding the numerous other materials plaintiff had belatedly produced following the close of fact discovery on April 29, 2016). Id. I further asked the Court to order plaintiff to pay the cost of this reopened discovery, as well as the cost of DFS's Spoliation Motion. Id. Guevara subsequently filed a response seeking similar relief. See Docket No. 55.

10.    On July 12, 2016, the Court issued an Order noting that "[t]he series of events as recounted here is passing strange" and directing that discovery be reopened for 90 days regarding the recording and any other discovery produced by plaintiff following the close of fact discovery. See Docket No. 56. The Court also "reserve[d] the right to impose attorneys' fees and costs for the reopening of discovery and reserve[d] the right to impose further sanctions should DFS's spoliation motion be granted." Id. Finally, the Court ordered that "[t]he spoliation motion may be revised and supplemented after reopened discovery is concluded." Id.

11.    Reopened discovery concluded on October 11, 2016. Id. During the course of the 90 days, DFS conducted reopened depositions of plaintiff and plaintiff's husband, Andrew Joe, as well as a reopened deposition of plaintiff's mental health counselor, Monika Jamrozek-Burra, and a new deposition of plaintiff's sister, Tammy Hsueh.[1]

12.    The relevant information obtained from this reopened discovery is described below.

**The Recording**

13.    The recording produced by Plaintiff in July 2016 is obviously incomplete, in that it cuts off mid-sentence. See Transcript of Recording, attached hereto as Exhibit 3.

14.    Moreover, as described in the accompanying Declaration of Allison Clavery,

---

[1] Plaintiff attempted to quash (and delay) the deposition of her sister, which was denied by the Court. See Docket Nos. 59-62.

dated November 7, 2016, the meeting at issue lasted approximately 45 minutes but the recording lasts only approximately ten minutes.  Accordingly, substantial portions of the meeting are missing from the recording.

15.      During their reopened depositions, I asked both plaintiff and her husband why the recording is incomplete and where the rest of it is.  Neither had any explanation for how or why the recording cuts off mid-sentence.  See Excerpts from Reopened Deposition of Tiffany Hsueh, attached hereto as Exhibit 4, at 199:6 – 202:9; and Excerpts from Reopened Deposition of Andrew Joe, attached hereto as Exhibit 5, at 111:18 – 113:10.  Indeed, Plaintiff's husband, who actually recovered the recording, acknowledged the possibility that only part of the recording was recovered and stated that he cannot be sure it is complete.  See Exhibit 5 at 110:3-14; 112:7-14; 113:8-10.[2]

16.      With respect to the portion of the incomplete recording that was produced by plaintiff, its contents undermine her allegations in this case.

17.      As described in the materials previously submitted in support of DFS's Spoliation Motion, the gist of plaintiff's claim against DFS is that the agency and, in particular, Allison Clavery, mishandled her internal complaint against Guevara.  See Docket Nos. 44-46.  Plaintiff specifically accuses Ms. Clavery of "tell[ing] her to stay quiet, failing to take her allegations seriously.  In fact, Ms. Clavery admonished Plaintiff to 'stay quiet' approximately a dozen

---

[2] Although plaintiff stated that she "believes" her recording device may have run out of space, she failed to provide any support for that belief.  See Exhibit 4 at 202:4-9.  Indeed, she acknowledged that she does not know how much time the device she used (an MP3 player) was capable of recording.  Id. at 260:6 – 261:15.  Nor can she determine its recording capacity now, because she has since "donated" the device.  Id. at 260:16-22.  Plaintiff's husband similarly "guessed" at a variety of possibilities for why the recording cuts off mid-sentence, such as the "recorder cut out or battery died or storage was full."  See Exhibit 5 at 112:16-24.  However, he acknowledged that he does not know if any of those possibilities actually took place.  Id. at 112:25 – 113:1.  He also confirmed that plaintiff discarded the recording device sometime between February and April of 2015.  Id. at 141:21 – 142:1.  This timing is significant because, as described in the materials previously submitted in support of DFS's Spoliation Motion, plaintiff's duty to preserve evidence in this case was manifest by December 2014 or January 2015 at the absolute latest.  See Docket Nos. 44-46.

times." See Docket No. 46 (quoting Complaint ¶ 36).

18.     At her initial deposition, held on April 20-21, 2016, plaintiff testified that she and Ms. Clavery had had two or three meetings, and that Ms. Clavery repeatedly told her to stay quiet "throughout the course of the two or three meetings." See Excerpt from Initial Deposition of Tiffany Hsueh, attached hereto as Exhibit 6, at 200:2-23.

19.     Yet the portion of the recording produced by plaintiff does not reflect Ms. Clavery saying "stay quiet" (or anything similar) even once. See Exhibit 3. Plaintiff admitted as much during her reopened deposition. See Exhibit 4 at 202:21 – 203:7.

20.     Plaintiff also alleged in her complaint that "[t]o date, DFS has not informed Plaintiff about anything regarding its investigation." See Docket No. 46 (quoting Complaint ¶ 37). Indeed, at her initial deposition, plaintiff claimed that she was never informed that Guevara had been placed on administrative leave after she filed her internal complaint and, moreover, that she was unaware of that fact until the very day of her deposition. See Exhibit 6 at 174:9 – 177:23. Plaintiff also claimed that she was never informed that building security had been instructed not to allow Guevara back onto the premises. Id. at 263:8 – 264:11.

21.     Yet the portion of the recording produced by plaintiff reflects that Ms. Clavery informed her of all the steps that were taken after she filed her internal complaint. See Exhibit 3 at 2:10-16. Specifically, Ms. Clavery told plaintiff that "when the complaint came in…he was put out, and then he was informed he was not allowed back [UNINTEL], he was not allowed back on the department premises. We took steps to notify security. We gave security his photo." Id.

22.     When questioned during her reopened deposition about these discrepancies, plaintiff acknowledged that she was aware as of the date of her recorded meeting with Ms.

5

Clavery of the steps that were taken in the wake of her internal complaint, including the fact that Guevara had been placed on leave and barred from the premises. See Exhibit 4 at 204:6 – 207:21.

23.      Based on the above, there is good cause to conclude that the unrecovered portion of the incomplete recording would further undermine plaintiff's allegations in this case.

**The Deletion**

24.      As described in the materials previously submitted in support of DFS's Spoliation Motion, plaintiff claimed to have deleted the recording of her meeting with Ms. Clavery because it was unclear and did not capture most of Ms. Clavery's responses. See Docket Nos. 44-46.

25.      Yet the incomplete recording produced by plaintiff, while unclear in some parts, did in fact capture many statements by both Ms. Clavery and plaintiff. See Exhibit 3. Indeed, plaintiff acknowledged after the recording was played during her reopened deposition that she had been able to hear what was said. See Exhibit 4 at 213:2-14.

26.      Plaintiff also testified that, despite its supposed inaudibility, she nevertheless transferred the recording of her meeting with Ms. Clavery to her computer after listening to it. Id. at 261:24 – 263:1. She further testified that she did not transfer other files contained on the same recording device to her computer and, in fact, that the recording was the only file from the device that she transferred. Id. at 261:16 –262:10; 263:12-16.

27.      Finally, plaintiff offered a new explanation for having deleted the recording. Specifically, she testified that she deleted the recording because she was worried about the legal implications of having recorded Ms. Clavery without her knowledge. Id. at 212:15-19; 263:5-11. Despite being repeatedly asked why she deleted the recording at her first deposition, plaintiff had never before offered this explanation. See Docket Nos. 44-46.

28.     Based on the above, there is good cause to conclude that plaintiff deleted the recording, including the unrecovered portion, because it undermined her allegations in this case.

**The Recovery**

29.     In my response to Mr. Frank's letter revealing the recovery of the incomplete recording, I noted that he had failed to describe any efforts made to locate the recording of plaintiff's meeting with Ms. Clavery prior to the day on which plaintiff's opposition to DFS's Spoliation Motion was due. See Docket No. 54. I argued that this inexplicable delay in attempting to recover the recording was itself sanctionable, given the time and expense incurred by DFS in making the Spoliation Motion. Id.

30.     Accordingly, during their reopened depositions, I asked both plaintiff and her husband when they had first attempted to recover the recording of plaintiff's meeting with Ms. Clavery. Both replied that their first and only attempts to recover the recording were made during the weekend immediately preceding the Monday on which plaintiff's opposition to DFS's Spoliation Motion was due. See Exhibit 4 at 195:5 – 197:12; and Exhibit 5 at 104:13 – 106:9.

31.     Specifically, plaintiff testified that her attempts to recover the recording occurred exclusively during the weekend of July 9-10, 2016. See Exhibit 4 at 196:1-23. She explained that she made the recovery attempts that weekend because she had just learned of DFS's Spoliation Motion. Id. at 196:24 –197:12.

32.     Plaintiff further testified that, when she was unable to recover the recording herself, she asked her husband for assistance. Id. at 197:24 – 198:4. She then took a nap, and her husband had recovered the recording by the time she woke up. Id. at 198:5-14. Her husband explained that he had located the recording on a hard drive. Id. at 198:15-16.

33.     Plaintiff's husband testified somewhat similarly. He stated that plaintiff first

7

asked him for assistance recovering the recording on July 9, 2016.  See Exhibit 5 at 104:22 –

105:21.  He also explained that the reason she asked for his assistance that day was DFS's

Spoliation Motion.  Id. at 106:3-9.

34.     Plaintiff's husband further testified that he recovered the recording from a back-

up drive he uses to back-up both his and plaintiff's computers.  Id. at 107:19-25.  That back-up

drive was the second place he looked for the recording (the first being plaintiff's computer).  Id.

at 108:9 – 109:13.  Once he decided to search the back-up-drive, the recording was not difficult

to recover; all he had to do was plug in the drive and check one of the folders.  Id. at 109:2-10.

35.     Based on the above, it is apparent that plaintiff made no attempt to recover the

recording of her meeting with Ms. Clavery prior to the weekend of July 9-10, 2016.  This is

despite the fact that, as described in the Procedural History section above, the issue of the

recording first arose in April 2016, the Court held a conference regarding that issue in May 2016,

and DFS filed its Spoliation Motion in June 2016 (after repeatedly asking plaintiff's attorney if

the recording could be recovered).

**Request for Relief**

36.     For the reasons described herein, as well as in the materials previously submitted

in support of the Spoliation Motion, see Docket Nos. 44-46, DFS respectfully renews its request

that the Court sanction plaintiff's spoliation by dismissing her claim against DFS (or, at the very

least, by imposing an adverse inference).

37.     DFS also requests that it be awarded the costs, including attorney's fees, incurred

in making the Spoliation Motion and conducting reopened discovery.  My response to Mr.

Frank's letter revealing the recovery of the incomplete recording cites case law supporting such

an award.  See Docket No. 54.  In the event that the Court is inclined to grant this request, DFS is

prepared to submit a supplemental memorandum of law and supporting documentation detailing the relevant costs and fees at the appropriate time.

I declare under penalty of perjury that the foregoing is true and correct.  This declaration was executed by me in New York, New York on this 7th day of November 2016.

Eva L. Dietz

# EXHIBIT 1

## Eva Dietz

| | |
|---|---|
| **From:** | Eva Dietz |
| **Sent:** | Tuesday, May 03, 2016 4:23 PM |
| **To:** | 'Joshua Frank' (jfrank@tpglaws.com) |
| **Cc:** | 'Law Offices of Albert Rizzo, P.C., 830 Third Avenue, NY, NY 10022' |
| **Subject:** | Hsueh v. DFS & Guevara |

Josh,

As you recall, plaintiff stated at her deposition that she recorded and deleted at least one of her meetings with Allison Clavery. Is there any way that the recording(s) can be retrieved or restored? It is obviously relevant to this case.

Eva

Eva L. Dietz
Assistant Attorney General
Office of the New York State Attorney General
120 Broadway
New York, NY 10271
T: (212) 416-6211
F: (212) 416-6009
eva.dietz@ag.ny.gov

**Eva Dietz**

| | |
|---|---|
| **From:** | Eva Dietz |
| **Sent:** | Wednesday, May 04, 2016 5:21 PM |
| **To:** | ''Joshua Frank' (jfrank@tpglaws.com)' |
| **Cc:** | 'Law Offices of Albert Rizzo, P.C., 830 Third Avenue, NY, NY 10022' |
| **Subject:** | RE: Hsueh v. DFS & Guevara |

Just following up on the below?

---

**From:** Eva Dietz
**Sent:** Tuesday, May 03, 2016 4:23 PM
**To:** 'Joshua Frank' (jfrank@tpglaws.com)
**Cc:** 'Law Offices of Albert Rizzo, P.C., 830 Third Avenue, NY, NY 10022'
**Subject:** Hsueh v. DFS & Guevara

Josh,

As you recall, plaintiff stated at her deposition that she recorded and deleted at least one of her meetings with Allison
Clavery. Is there any way that the recording(s) can be retrieved or restored? It is obviously relevant to this case.

Eva

Eva L. Dietz
Assistant Attorney General
Office of the New York State Attorney General
120 Broadway
New York, NY 10271
T: (212) 416-6211
F: (212) 416-6009
eva.dietz@ag.ny.gov

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                            :
                                       Docket #15cv3401
 TIFFANY HSUEH,                   :

                 Plaintiff,       :

 - against -                      :

NEW YORK STATE DEPARTMENT OF      :
FINANCIAL SERVICES, et al.,           New York, New York
                                  : May 10, 2016
                 Defendants.
----------------------------------:

PROCEEDINGS BEFORE
THE HONORABLE PAUL A. CROTTY,
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For Plaintiff:          PHILLIPS & ASSOCIATE, PLLC
                        BY:  JOSHUA FRANK, ESQ.
                        45 Broadway, Suite 620
                        New York, NY 10006


For Defendant DFS:      OFFICE OF THE NEW YORK STATE
                           ATTORNEY GENERAL
                        BY:  EVA DIETZ, ESQ.
                        120 Broadway
                        New York, New York 10271


For Defendant Guevara:  ALBERT RIZZO, ESQ.
                        830 Third Avenue
                        New York, New York 10022




Transcription Service: Carole Ludwig, *Transcription Services*
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

```
 1                                                    19
 2              THE COURT:   Why?
 3              MR. RIZZO:   Well, because we're entitléd to see
 4    the facts as they alleged, as they were alleged in the
 5    criminal court action to enable us to compare it against the
 6    emotional distress claim that she's making now in this case.
 7              THE COURT:   Well, I don't agree with that.  I
 8    think what you ought to do is proceed as I've suggested and
 9    have Mr. Frank be in touch with his client, have the client
10    authorize former counsel to produce the civil file, take a
11    look at the civil file, and see where you go from there.
12    I'm not going to direct that - I'm not gonna quash the
13    subpoena addressed to the police department, but I'm not
14    going to ask Miss Hsueh to consent to any of them.  Okay,
15    does that take care of all the matters in your April 28
16    letter, Miss Dietz?
17              MS. DIETZ:   Yes, Your Honor.
18              THE COURT:   Now what about the spoliation
19    sanctions?  That's your next letter of May 6.
20              MS. DIETZ:   Yes, Your Honor.  That arose from
21    deposition testimony.  Plaintiff's complaint against DFS is
22    that they mishandled her internal complaint.  In her
23    complaint and in her deposition testimony, she makes all
24    kinds of allegations about what Allison Clavery, the DFS
25    employee who was responsible for investigating her
```

```
 1                                                    20
 2  complaint, did and didn't do, said and didn't say.  And then
 3  at her deposition plaintiff revealed that she had secretly
 4  recorded at least one of these meetings with Allison Clavery
 5  and then deleted it.
 6          So that is extremely significant evidence because
 7  the crux of the case here is that Miss Clavery mishandled
 8  the internal complain and said certain things, didn't say
 9  certain things, did certain things, didn't do certain
10  things.  And to have a record of at least one of these
11  actual meetings would be obviously highly relevant and
12  probative in this case.  And the fact that plaintiff has
13  willfully deleted it we believe should result in severe
14  spoliation sanctions, including, but not limited to,
15  dismissal of the claim of DFS because this goes to the heart
16  of that claim and, at the very least, an adverse inference
17  that what was on that tape or tapes was helpful to DFS and
18  went against plaintiff's allegations in this case.
19          THE COURT:  Has Miss Clavery been deposed yet?
20          MS. DIETZ:  Yes.
21          THE COURT:  What does she say?
22          MS. DIETZ:  Oh, she wasn't aware she was being
23  recorded.
24          THE COURT:  No, no, no.  What does she say about
25  her advice and her interactions with the plaintiff?
```

```
 1                                                21
 2         MS. DIETZ:   Oh, completely disputes allegations,
 3  that she was very helpful, she didn't say the things that
 4  plaintiff alleges that she said, that she handled the
 5  complaint appropriately, she took it seriously.   It's
 6  diametrically opposed to what plaintiff is alleging in this
 7  case.
 8         THE COURT:   Mr. Frank.
 9         MR. FRANK:   Well, I think I guess to start point
10  by point.   For as an initial matter, Miss Dietz's
11  characterization of the nature of the claim against DFS is a
12  little bit truncated, it's a little bit more nuanced, and
13  there's a little bit more to it than that.   There's also an
14  allegation that DFS failed to reasonably respond to
15  plaintiff's complaints initially before Allison Clavery even
16  received the complaint.   So there's plenty of allegations
17  that pertain to a mishandling of her complaints before that
18  juncture.   So I wanted to note that as well.
19         Plaintiff did testify that she had recorded what
20  she believed to be one meeting with Miss Clavery, that she
21  played back the recording to herself, wished it had been
22  clearer but it was not clear, and deleted it.   That was her
23  testimony in sum and substance.   I think it's also helpful
24  to note that Miss Clavery, by and through counsel for DFS,
25  produced what purports to be a summary of minutes relating
```

1                                          22

2   to her meetings, her one-on-one meetings with Miss Hsueh,

3   such that she allegedly created her own record of that as

4   well.

5         I don't believe that – I'm not advocating that,

6   you know, it's good to delete recordings, but I think it's

7   important to look at this in context.  I don't think it will

8   meet the elements necessary for the most draconian dismissal

9   of remedy which is dismissal of the action, and I don't

10  think that it's necessary for an adverse inference.  I'd be

11  happy to brief that.

12        THE COURT:   Okay.  I mean I'm just reading what

13  Miss Hsueh said at the deposition at page 206:

14            "Why were you recording the conversations

15            with Miss Clavery?"

16            A:   Because she had not taken, I do not

17            feel she was responding appropriately to my

18            harassment complaints."

19            Q:·  How were you taping your

20            conversations with her?

21            A:   Because it would show what exactly

22            she was saying, her actions and whatever things

23            she was telling me, like telling me to stay

24            quiet and stay silent and be quiet."

25  It strikes me as she's trying to get relevant information

23

and she destroyed it, and the fact that Miss Clavery kept

records is interesting because it points out - and those

records have been produced to you, Mr. Frank - but a record

made by your client can't be produced because your client

destroyed it.  So I think the motion for sanctions is

appropriate.  And I gather you don't disagree with that.

You just are concerned about what sanctions might be

imposed.  So how much time do you need, Mr. Dietz, for your

motion in light of the fact that you're leaving?

            MS. DIETZ:   Perhaps mid-June.  That will be two

weeks after I get back.

            THE COURT:   When in June?

            MS. DIETZ:   Maybe somewhere around June 15 or - I

don't have a calendar.

            THE COURT:   June 13, Monday.

            MS. DIETZ:   Maybe Wednesday, maybe the 15th.

            THE COURT:   I do things on Mondays.

            MS. DIETZ:   Oh, Mondays, okay, June 13.

            THE COURT:   June 13.  Mr. Frank, how much time to

respond?

            MR. FRANK:   I think three weeks will be helpful.

            THE COURT:   Okay.

            MS. DIETZ:   In that case, Your Honor, is there

any way I can get till June 20, and that gives me three

                                                          24

 1
 2  weeks after I get back to do the motion?

 3          THE COURT:   You'll work on it until you go away.

 4  Maybe somebody else at the Attorney General's office – it's

 5  pretty clear what your motion's gonna be.   We don't need an

 6  awful lot of scholarship on it.   And it's important to get

 7  these things out of the way as soon as we can.   June 13 for

 8  the motion.   You got July 4 in there, Mr. Frank, so I'll

 9  give you until – July 4 is a Monday.   I won't force you to

10  do the work over – July 11 for your response.

11          MR. FRANK:   Thank you, Your Honor.

12          THE COURT:   Your reply, Miss Dietz, by July 25.

13          MS. DIETZ:   Thank you, Your Honor.

14          THE COURT:   Now, from the time – my recollection,

15  Mr. Frank, is that from the time of the alleged harassment

16  started till Mr. Guevara retired was eight months.

17          MR. FRANK:   Approximately, that's right.

18          THE COURT:   Approximately eight months.   And when

19  did your client first bring this to human resources'

20  attention or Equal Opportunity, wherever Miss Clavery

21  worked?

22          MR. FRANK:   Your Honor, if you – if you don't

23  mind indulging me while I just be sure to double-check my

24  memory with the complaint.   Miss Hsueh first complained

25  about the harassment to her supervisors, to two of her

# EXHIBIT 3



Page 1

1

2

3

4

5

6

7

8

9

10

11

12

13    Hsueh v. Department of Finance

14

15

16

17

18

19

20

21

22

23

24

25

Page 2

1          WOMAN 1: [UNINTEL] for any another

2     additional questions that you have, [UNINTEL],

3     all right? [UNINTEL]. So I [UNINTEL]. I know you

4     indicated [UNINTEL].

5          TIFFANY HSUEH: I don't understand why

6     people weren't aware what they did, because they

7     [UNINTEL]--who, okay. They still let him back

8     into the building, they still [UNINTEL] upstairs.

9          WOMAN 1: Okay, hold on. Who let him

10    back in the building? You indicated someone. Now,

11    okay, when the complaint came in, [UNINTEL], for

12    something extremely [UNINTEL], or something, he

13    was put out, and then he was informed he was not

14    allowed back [UNINTEL], he was not allowed back

15    on the department premises. We took steps to

16    notify security. We gave security his photo. You

17    indicated someone let him enter. Can I have the

18    name of the [UNINTEL]--

19          TIFFANY HSUEH: I don't [UNINTEL], okay?

20    I had [UNINTEL] saying that [UNINTEL]. And so

21    [UNINTEL] didn't make any kind of statement at

22    all, there was nothing on the [UNINTEL] tape,

23    there was no department-wide email, there was

24    [UNINTEL], saying that, you know, it was such a

25    shame, what happened to him, because [UNINTEL],

Page 3

1  because there was barely any--

2         WOMAN 1: [UNINTEL]

3         TIFFANY HSUEH: Because they just think

4  he's a friendly old man, and that they can keep

5  inviting him back into the building, and he'll be

6  perfectly friendly and harmless. And he's not

7  harmless.

8         WOMAN 1: Tiffany, Tiffany, calm down.

9  Tiffany, calm down. Tiffany, tiffany--

10        TIFFANY HSUEH: You don't know what

11 he's--you don't know--he grabbed me, he felt like

12 he could put his hands on me.

13        WOMAN 1: I know, Tiffany, [UNINTEL]. In

14 [UNINTEL] investigation, [UNINTEL] he was put

15 out, he was put out--

16        TIFFANY HSUEH: Maybe he's not scary to

17 you, because he's never grabbed you. He can--he

18 had a proprietary air about him where he's like,

19 he felt like I was a toy, [UNINTEL] but like--

20        WOMAN 1: Tiffany, can you calm down?

21 Okay, calm down, calm down. I'm trying to get

22 [UNINTEL]--okay, so now [UNINTEL], asking why

23 human resources didn't put something on [UNINTEL]

24 department, can you repeat that?

25        TIFFANY HSUEH: Any kind of notification

Page 4

1   [UNINTEL], you know, nothing.

2          WOMAN 1: You want it done, and

3   [UNINTEL] to go out to the department? [UNINTEL]

4   to go out to the department, you want [UNINTEL].

5   [UNINTEL] you have what other additional

6   questions [UNINTEL], because you're asking

7   [UNINTEL] something that will be put out in an

8   email, [UNINTEL] to the department [UNINTEL], and

9   you wanted this to come from HR, right? Okay.

10  [UNINTEL]

11         TIFFANY HSUEH: I don't know if

12  [UNINTEL]. In the other buildings, they have

13  people's sign-in sheets. Look at them. [UNINTEL]

14  we have an elevator downstairs where--

15         WOMAN 1: Where what? I don't know

16  [UNINTEL]--

17         TIFFANY HSUEH: Where you can go back

18  and look at the records, where he was allowed

19  into the building, we can check the security

20  cameras, that he was allowed into the building.

21  And if you say security was given his picture,

22  and not supposed to be allowed back in, how does

23  he get through, then?

24         WOMAN 1: Well, that's what I'm trying

25  to find out. Who was [UNINTEL], who he came in

Page 5

1  with? That's what I'm asking. [UNINTEL] came

2  through that door [UNINTEL]. He was [UNINTEL],

3  and he's been no longer an employee of the

4  Department of Financial Services. He's no longer

5  an employee of the Department of Financial

6  Services.

7         We did everything that we could to

8  ensure that you could come to work and be

9  comfortable. We [UNINTEL] that you can come to

10  work comfortably, that's what we did. [UNINTEL]

11  you wanted to email-- I'm just going to get, you

12  want an email to go out to the department

13  employees, is that what you--you wanted HR to

14  send an email out to the department employees.

15  Well, I don't have control [UNINTEL], but that's

16  all I can do, [UNINTEL], I can't do anything

17  else, because as I said, my--I do not have the

18  power to do that, to send out department-wide

19  emails.

20         TIFFANY HSUEH: [UNINTEL], because I

21  thought [UNINTEL] is aware that--instead, nothing

22  was said about him.

23         WOMAN 1: Well, [UNINTEL].

24         TIFFANY HSUEH: Nothing was said about

25  him, nothing about--

1         WOMAN 1: Well, okay, who do you want--
2         TIFFANY HSUEH: Nothing about what he
3    did.
4         WOMAN 1: You wanted HR to--oh no, you
5    said you wanted HR to [UNINTEL]. Okay, and you--
6    I'm not sure, did you--we are now all mandated to
7    take the online sexual harassment awareness, the
8    [UNINTEL], we've all been mandated to take it, as
9    you're aware. We all take that course, we all
10   take that online training, where we're required
11   to take it and complete it, and we do get
12   confirmation that [UNINTEL].
13        TIFFANY HSUEH: [UNINTEL] stopping.
14   [UNINTEL] stopping, and the way things are--
15        WOMAN 1: Did you say you wanted Human
16   Resources to [UNINTEL] sexual harassment
17   [UNINTEL]--
18        TIFFANY HSUEH: The way HR handled the
19   case, all it says is, "Okay, well, you know, if
20   you sexually harass someone, you know, we're not
21   going to say anything. We're going to keep it
22   quiet. We're going to tell her to keep quiet, and
23   we're going to let you retire." And you know,
24   anytime you want to visit the building, all you
25   have to have is someone invite you back in.

1   That's what I've seen happen to investigations so

2   far.

3            WOMAN 1: Okay, first and foremost,

4   Human Resources does not investigate [UNINTEL]--

5            TIFFANY HSUEH: Yeah, you know, and if

6   you tell her to keep quiet, and she doesn't say

7   anything, well, you know, you can say that you

8   were innocent, and have other people feel bad for

9   you, and take up a money collection. You get a

10  award at the end. You get reward money.

11           WOMAN 1: HR, as I told you, does not

12  investigate complaints of [UNINTEL], sexual

13  harassment falls under discrimination.

14           HR does not investigate them. I

15  investigate them. I am not part of Human

16  Resources management. I am not a part of Human

17  Resources management. I am independent of Human

18  Resources, so I do not [UNINTEL] HR does not

19  investigate any type of sexual harassment

20  complaints. I do the investigations, as the

21  affirmative action administrator for the

22  department.

23           [UNINTEL], that's the reason why

24  [UNINTEL] we met, and we met on a couple of

25  occasions, I [UNINTEL] any additional questions,

Page 8

```
 1    [UNINTEL] reach out to me, and I'm available to

 2    meet with you, I'm available to talk to you--

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 9

1

2                    C E R T I F I C A T I O N

3

4        I, Sonya Ledanski Hyde, certify that the

5    foregoing transcript is a true and accurate

6    record of the proceedings.

7

8

9

10   _____

11

12   Veritext Legal Solutions

13   330 Old Country Road

14   Suite 300

15   Mineola, NY 11501

16

17   Date: August 29, 2016

18

19

20

21

22

23

24

25

# EXHIBIT 4

Page 1

1   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

2

    --------------------------------X

3   TIFFANY HSUEH,

4                            Plaintiff,

5        -against-

6   THE NEW YORK STATE DEPARTMENT OF

    FINANCIAL SERVICES, a/k/a THE DEPARTMENT OF

7   FINANCIAL SERVICES and ABRAHAM GUEVARA,

    individually,

8

                             Defendants.

9   --------------------------------X

10

11                  September 9, 2016

                    9:59 a.m.

12

13        EXAMINATION BEFORE TRIAL of TIFFANY HSUEH held at the

14   State of New York Office of the Attorney General, 120

15   Broadway, 24th Floor, New York, New York before

16   ELIZABETH C. GLENNON, a Notary Public of the

17   State of New York.

18

19

20

21

22

23

24

25

1          last month of a meeting you had with who?

2          A.      With Allison Calvary.

3          Q.      That you secretly recorded?

4          A.      Yes.

5          Q.      When did you first try to recover that

6   recording?

7          A.      In July.

8          Q.      Why in July?

9          A.      I had been informed of heavy sanctions.

10         Q.      Can you explain what you mean by that?

11         A.      I learned about the sanctions.

12         Q.      This is now July 2016?

13         A.      It was July.

14         Q.      July of this year?

15         A.      Yes.

16         Q.      As in two months ago?

17         A.      Yes.

18         Q.      That's the first time you tried recover

19   the recording?

20         A.      Yes.

21         Q.      Were you able to recover it when you first

22   tried?

23         A.      When I first tried?

24         Q.      Yes.

25         A.      My first attempts, no.

1          Q.      How many attempts did you make?

2          A.      I was trying that weekend.

3          Q.      Which weekend?

4          A.      Of July 2016.

5          Q.      What weekend in particular?

6          A.      I don't remember the exact date.  It was

7      just July 2016.

8                  MS. DIETZ:  We'll mark this.

9                  (Whereupon, Email from Josh Frank dated

10          July 11, 2016 was marked as Defendants' Exhibit 27

11          for Identification, as of this date.)

12          Q.      Exhibit 27 is stating that you sent him an

13      email with the recording on July 10th, which would have

14      been a Sunday?

15          A.      Yes.

16          Q.      Is that the day you recovered the

17      recording?

18          A.      Yes.

19          Q.      Was this the only day on which you

20      attempted to recover the recording?

21          A.      I had been trying the whole weekend.

22          Q.      So July 9th and 10th?

23          A.      Yes.

24          Q.      Why that weekend in particular?

25          A.      I learned of the sanctions.

1          Q.      Are you referring to the spoliation motion

2     for sanctions?

3          A.      It was sanctions.

4          Q.      So you learned that defendants were

5     seeking sanctions?

6          A.      Yes.

7          Q.      And you learned it that weekend?

8          A.      Yes.

9          Q.      And that's why you decided to try to

10    recover the recording?

11         A.      The sanctions were very heavy, so I

12    attempted to do my best to find the recording.

13         Q.      The email your attorney forwarded is from

14    someone named Madison River?

15         A.      Yes.

16         Q.      Who is that?

17         A.      That's me.

18         Q.      You're Madison River?

19         A.      Yes.  That's the name I used to create the

20    account.

21         Q.      Why would you use a name other than yours?

22         A.      Because it's the internet, and my parents

23    told me not reveal my true name.

24         Q.      How was the recording recovered?

25         A.      I had been searching for the recording,

Page 198

```
 1        and I couldn't find it on my computer or any of my
 2        files, and I was getting very upset as the weekend wore
 3        on, and I kept trying to find the files, and I asked my
 4        husband to help me, and he found it.
 5             Q.      How did he find it?
 6             A.      I don't know exactly how.
 7             Q.      Were you present when he recovered it?
 8             A.      No.
 9             Q.      So you asked him to help and left the room
10        or left the apartment?
11             A.      I took a nap.
12             Q.      By the time you woke up, he had found the
13        recording?
14             A.      Yes.  He showed it to me.
15             Q.      Did he tell you how he recovered it?
16             A.      The hard drive.
17             Q.      Had you tried the hard drive yourself?
18             A.      Yes.
19             Q.      What did he do that was different?
20             A.      I don't know.
21             Q.      How did you feel when he recovered the
22        recording?
23             A.      I felt all the stress and all the
24        anxiousness and nervousness leave, and I was relieved.
25             Q.      Why?
```

1          A.      I found the recording I was searching for.

2          Q.      You thought by finding the recording you

3     would eliminate any sanctions against you?

4          A.      I was just told there was heavy sanctions

5     in connection with the recording.

6          Q.      Was the entire recording recovered?

7          A.      Yes.

8          Q.      How can you be sure?

9          A.      It's the only recording I have.

10         Q.      I'm asking if the entire recording was

11    recovered?

12         A.      That's the entre recording.

13         Q.      How do you know?

14         A.      I only made one recording.

15         Q.      I understand you only made one.  I'm

16    asking if it's possible only part was recovered.

17         A.      No.

18         Q.      Why are you sure?

19         A.      Because it's the only recording.

20         Q.      I am asking how you are sure the entire

21    recording was recovered?

22         A.      The entire recording was that one

23    recording.

24         Q.      How do you know the entire recording, as

25    opposed a part of the recording, was recovered?

1          A.      I am sure because it was the one recording

2     I had made.

3          Q.      How are you sure it's the entire

4     recording?

5          A.      That's the entire recording.

6          Q.      How do you know?

7          A.      I only made one recording.

8               MR. FRANK:  How do you know that recording

9          contains everything you recorded?

10              THE WITNESS:  I don't remember how long

11         the meeting was, but that's the only one

12         recording.

13         Q.      Is it possible part of the meeting was not

14    recovered?

15         A.      That's the one file.

16         Q.      It is possible only part of it was

17    recovered?

18         A.      I don't know how to answer your question.

19    I only had the one recording.

20              MR. FRANK:  What she's asking is whatever

21         you recorded, did you recover everything you

22         recorded.

23              THE WITNESS:  Yes.

24         Q.      How do you know that?

25         A.      It's just the one.

Page 201

1          MR. RIZZO:  Did you listen to the

2     recording once your husband found it?

3          THE WITNESS:  Yes.

4          MR. RIZZO:  Did you listen to it in its

5     entirety?

6          THE WITNESS:  Yes.

7          MR. RIZZO:  Is it your testimony today

8     that that recording is complete?

9          THE WITNESS:  Yes.

10     Q.     How can you be sure?

11     A.     I'm sure because it's the only one I made.

12     Q.     Is it possible that part of the recording

13     you made is still lost?

14     A.     I don't see how that is possible.

15          MS. DIETZ:  Let's play the recording.  You

16     don't have to transcribe this.

17          (Whereupon a recording was played.)

18     Q.     The recording cut the off mid sentence,

19     right?

20     A.     I suppose so.

21     Q.     Where is the rest of it?  Why does it cut

22     off mid sentence?

23     A.     I don't know.

24     Q.     Is it possible there is more of it?

25     A.     No.

```
1        Q.      Since it cuts off mid sentence, how do you
2    know your husband recovered the whole thing?
3        A.      I only made one recording.
4        Q.      How do you know your husband recovered the
5    whole thing?
6        A.      That's as far as the space on my recorder
7    had.
8        Q.      That's your testimony?
9        A.      That's what I believe.
10       Q.      This recording isn't helpful for your
11   case, is it?
12               MR. FRANK:  Objection to form.
13       A.      I don't know if it is or isn't.
14       Q.      It doesn't support your allegation against
15   DFS, does it?
16               MR. FRANK:  Same objection.
17       A.      She was dodging every question I had and
18   avoiding questions and kept telling me she was
19   independent, and she wasn't part of DFS, and she wasn't
20   being helpful at all.
21       Q.      She never tells you to stay quiet, keep
22   quiet?
23       A.      Not on the recording, no.
24       Q.      So it happens you recorded the one meeting
25   she didn't say that?
```

```
 1                 MR. FRANK:  Objection to form.
 2         A.      I believe in the investigation report she
 3    said herself --
 4         Q.      That's not a correct characterization of
 5    the report.  I'll ask again.  She doesn't tell you to
 6    stay quiet, does she?
 7         A.      In this recording, no.
 8         Q.      But you happened to record the one time
 9    she didn't tell you to stay quiet?
10                 MR. FRANK:  Objection to form.
11         A.      She had written in her documents she told
12    me to keep quiet as well.
13         Q.      She also tells you the steps DFS took
14    after your complaint of Mr. Guevara, right?
15         A.      She was not telling me anything when I was
16    asking her for any investigation updates.
17         Q.      She tells you he was put out, told he was
18    not allowed on the premises, his picture was given to
19    security, all on this tape?
20         A.      She was not answering emails and had not
21    answered questions previous to this tape.
22         Q.      As of this day, you knew all of the steps
23    that were taken, because she told you that on this
24    tape?
25         A.      Prior to --
```

Page 204

1          Q.      I'm asking on this tape.

2          A.      Prior to this day, she did not tell me

3     that.

4          Q.      But as of this day, you knew that, right?

5          A.      As of today?

6          Q.      No.  As of the date of this recording of

7     your meeting with Allison, you knew all those steps had

8     been taken, right?

9          A.      I knew she told me at this meeting.

10          Q.      But you claimed at your deposition in

11     April you did not know Mr. Guevara had been placed on

12     leave until that day, until I was telling you, right?

13          A.      There was no notice of a suspension or

14     retirement.

15          Q.      But you knew because Allison told you,

16     right?

17          A.      I did not know.

18          Q.      Didn't Allison tell you?  Didn't we just

19     hear her tell you?

20          A.      She said it on the recording.

21          Q.      So you knew, because she told you, right?

22          A.      I didn't know prior.

23          Q.      I'm saying on that date when this meeting

24     happened, you knew, right?

25          A.      On the date of the meeting, yes.

1           MS. DIETZ:  I'll mark my next exhibit.

2           (Whereupon, transcript was marked as

3       Defendants' Exhibit 28 for Identification, as of

4       this date.)

5           Q.      Exhibit 28 is an excerpt of the transcript

6       of your deposition taken on April 20th.  Ms. Hsueh,

7       please read page 177?

8           A.      I would like to say I was not notified he

9       was on suspension.  I was not told he retired.  There

10      was no notification.  I only knew that date when

11      Allison had said so.

12          Q.      Great.  Can you read page 177?

13          A.      I am.

14          Q.      Can you look at it?

15          A.      I am looking.  Yes.  I read it.

16          Q.      On page 177, you say, "No.  No one ever

17      told me he was placed on leave."

18              "QUESTION:  You know today he was placed

19      on leave, right?

20              ANSWER:  I know today because you are

21      telling me.

22              QUESTION:  Today is the first time you

23      learned Mr. Guevara was placed on leave?

24              ANSWER:  Actually, yes."

25              Do you see that testimony?

Page 206

1           A.      Yes.

2           Q.      That's not true, right?

3           A.      I don't remember Allison telling me.

4           Q.      So is it possible she told you something

5     and you don't remember?

6           A.      Such as.

7           Q.      Anything else.  You claim you weren't

8     notified of a whole host of things.  Now it turns out

9     maybe you don't remember being told of those things; is

10    that possible?

11          A.      I can't say unless you tell me

12    specifically.

13          Q.      On page 177 of your sworn testimony, you

14    say you are learning for the first time Mr. Guevara was

15    placed on leave, but that isn't true, is it?

16          A.      All I remember is while he was placed on

17    leave and for months afterward, I was not told.

18          Q.      But you testified under oath --

19          A.      I was not told he was placed on leave.  I

20    was not even given the courtesy of being told he

21    retired.

22          Q.      You testified on April 20, 2016, that that

23    was the first time you learned Mr. Guevara was placed

24    on leave.  You testified to that under oath.

25          A.      I do not remember being told prior.

1          Q.       But now we know you were, because we

2     played this tape.  This tape was made prior to

3     April 20, 2016, wasn't it?

4          A.       I don't know.

5          Q.       It's possible you made that tape after?

6     You already testified under oath about when you made

7     this tape.

8          A.       I don't remember all the details.

9          Q.       I'm asking you on this tape Allison tells

10     you all the steps that were taken once you filed your

11     complaint?

12          A.       She also said he wasn't allowed back into

13     the building so how was he allowed back in the

14     building.

15               MR. FRANK:  Try to listen to and answer

16          the question.

17          Q.       On this tape, Allison tells you all the

18     steps that were taken, that he was put out, told not

19     come to the premises, and his picture was given to

20     security, right?

21          A.       Yes.

22          Q.       So you knew all of this?

23          A.       I do not remember every single detail of

24     my conversation with Allison.

25          Q.       Allison also tells you she did everything

1          Q.       It's your understanding sexual harassment

2      victims can't take out a restraining order.

3          A.       I did not know if we could or couldn't.

4          Q.       Did you look into it?

5          A.       No.  Because from my understanding, a

6      restraining order was from domestic violence.

7          Q.       What was that understanding based on?

8          A.       Reading about restraining orders.

9          Q.       When did you read about them?

10         A.       Over the years.

11         Q.       You, over the years, happened to read

12     about restraining orders?  Why?

13         A.       Anything in the news, if a restraining

14     order had been taken out.

15         Q.       You deleted this recording because it's

16     not helpful for your case, right?

17         A.       No.  Because I could barely hear it, and I

18     was also nervous if it was legal to record without

19     permission.

20         Q.       If you were worried about if it was legal,

21     why did you do it?

22         A.       It was for my own records and so I could

23     more clearly hear Allison or understand, because I was

24     very upset during our meeting, and I did not remember

25     every detail she told me, so I wanted to go back over

Page 213

1      her answers.

2              Q.      Why did you delete it?

3              A.      Because it was not audible.

4              Q.      We heard it today.  We were just talking

5      about what was said.

6              A.      When I had it, I was not able to hear it.

7              Q.      This is a government office.  This is not

8      high tech equipment.  It's your testimony it's because

9      of this equipment we can suddenly hear what you said?

10             MR. FRANK:  Objection.

11             A.      I'm saying my own recording from my

12     equipment, I couldn't hear much.

13             Q.      But you could you hear it today?

14             A.      Yes.  With your speakers.

15             Q.      Did you record other conversations?

16             A.      No.

17             Q.      Why?

18             A.      I made one attempt, and it was barely

19     audible, so I discontinued any attempt.

20             Q.      Did you record conversations with anyone

21     else at DFS?

22             A.      No.

23             Q.      Why not?

24             A.      I did not have a good recorder.

25             MS. DIETZ:  I think that's all I have.

Page 260

1              MR. FRANK:  I missed the response.

2              MS. DIETZ:  She closed out the card, which

3        is not an appropriate response.  I'm going to have

4        to call for production.  You can take it under

5        advisement.

6        Q.      Talking about now the recording we

7   listened to earlier, how was it recorded, on what kind

8   of device?

9        A.      MP3 player.

10       Q.      Forgive me.  I'm not up on the technology.

11   What kind of device is it?

12       A.      It plays audio files.

13       Q.      Right but is it what we used to call a

14   tape recorder?  It is digital?

15       A.      MP3 digital.

16       Q.      Do you still have that?

17       A.      No.

18       Q.      What happened to it?

19       A.      I downsized from my two bedroom to a one

20   bedroom and donated most of my belongings.

21       Q.      Why would you donate the recorder?

22       A.      I no longer needed it.

23       Q.      How big was it?

24       A.      (indicating)

25       Q.      So you're indicating three inches wide by

Page 261

```
 1          eight inches?  That's a big recorder.

 2                A.      (indicating)

 3                Q.      So now we're at two inches wide by eight

 4          inches long?

 5                A.      I can't say.  That's how I remember it

 6          being.

 7                Q.      Do you know the make and model?

 8                A.      No.  I think it was a Sony.

 9                Q.      Do you know what type of Sony?

10                A.      No.

11                Q.      Do you know what the capacity was for the

12          recorder?

13                A.      No.

14                Q.      How much time it could record?

15                A.      No.

16                Q.      Did you have anything recorded on the

17          recorder at the time you recorded your meeting with

18          Ms. Calvary?

19                A.      I don't remember.

20                Q.      Was it blank?

21                A.      I believe I had song files on it.

22                Q.      How many song files?

23                A.      I don't remember exactly how many.

24                Q.      What happened to these files on the

25          recorder; did you transfer them to the computer?
```

1          A.      Yes.   I transferred the recorder to the

2   computer.

3          Q.      Did you transfer the songs also to your

4   computer?

5                  MR. FRANK:   Generally speaking?

6                  MR. RIZZO:   In this particular instance.

7          A.      No.   I didn't transfer the song files.

8          Q.      You only transferred the meeting you had

9   with Ms. Calvary?

10         A.      Yes.

11         Q.      Was that transferred to a computer that

12  you still have?

13         A.      Yes.

14         Q.      When did you do the transfer?

15         A.      I believe shortly after I made the

16  recording.

17         Q.      Shortly after the meeting?

18         A.      Shortly after I made the recording.

19         Q.      Did you listen to recording before you

20  transferred it?

21         A.      I did listen to it, yes.

22         Q.      Could you hear it clearly on the recorder?

23         A.      No.

24         Q.      Why would you have transferred it if you

25  couldn't hear it on the recorder?

1          A.      Just to keep it on my computer.

2          Q.      Then you deleted it?

3          A.      Yes.

4          Q.      Why would you have deleted it?

5          A.      I couldn't hear most of it, and I was

6     wondering if it was legal.

7          Q.      Who would have known -- why were you

8     concerned about whether or not it was legal?

9          A.      I just didn't know if it was allowed or if

10     I needed a signature or if they have to be aware.   I

11     was frightened, and the recording was full of static.

12          Q.      Did you transfer anything else from that

13     recorder?

14                  MR. FRANK:   At that time?

15          Q.      At that time.

16          A.      No.

17          Q.      You say your husband found it on the hard

18     drive of the computer?

19          A.      I don't know exactly how he found it.   He

20     said the hard drive.

21          Q.      When did you delete it?

22          A.      I don't remember.

23          Q.      How soon after the meeting or the transfer

24     onto the computer did you do it?

25          A.      I can't say.   I had it on my computer and

# EXHIBIT 5

ANDREW JOE

Page 1

1    UNITED STATES DISTRICT COURT

      SOUTHERN DISTRICT OF NEW YORK

2

     --------------------------------X

3    TIFFANY HSUEH,

4                    Plaintiff,

5       -against-

6    THE NEW YORK STATE DEPARTMENT OF

      FINANCIAL SERVICES, a/k/a THE DEPARTMENT OF

7    FINANCIAL SERVICES and ABRAHAM GUEVARA,

      individually,

8

                   Defendants.

9     --------------------------------X

10

11            September 16, 2016

             9:00 a.m.

12

13        DEPOSITION of ANDREW JOE held at the State of New York

14   Office of the Attorney General, 120 Broadway, 24th Floor, New

15   York, New York before ELIZABETH C. GLENNON, a Notary Public of

16   the State of New York.

17

18

19

20

21

22

23

24

25

ANDREW JOE

1          Q.      Why is that what sticks out in your head?

2          A.      Because I know of what we're going

3     through, the whole reason I am here again is because

4     she had deleted that and I recovered it.

5          Q.      Why is that causing you to remember one

6     part of a conversation and not another?

7          A.      I don't know.  That's just how I remember

8     it.

9          Q.      You don't recall or do you recall if she

10    told you why she made the recording in the first place?

11         A.      No.  I do not recall why she made the

12    recording.

13         Q.      When did Tiffany ask you for help

14    recovering the recording?

15         A.      The Saturday it was recovered.

16         Q.      That's first time she asked you for help?

17         A.      Yes.

18                 MS. DIETZ:  I'd like to mark this.

19                 (Whereupon, Email 7/11/16 was marked as

20             Defendants' Exhibit 13 for Identification, as of

21             this date.)

22         Q.      This is an email from Josh Frank to me and

23    Al Rizzo saying, "I received an email from my client

24    yesterday evening attaching the recording."

25                 Do you see that?

ANDREW JOE

1          A.       I'm sorry what are we looking at?

2          Q.       We're looking at this email.  It says, "I

3    received an email from my client yesterday evening,

4    which appears to be the subject recording."

5                   Do you see that?

6          A.       Yes.

7          Q.       He sent that Monday, July 11th?

8          A.       Yes.

9          Q.       So does this refresh your recollection as

10   to the date on which you first attempted to recover the

11   recording?

12         A.       Yes.

13         Q.       So what date would that be?

14         A.       So that would be the 9th -- Saturday, July

15   9th.

16         Q.       And that was the first time you ever tried

17   to recover the recording?

18         A.       Yes.

19         Q.       First time Tiffany ever asked you to

20   recover the recording?

21         A.       Yes.

22         Q.       Do you know if Tiffany had attempted to

23   recover the recording before that?

24         A.       I don't know.

25         Q.       Because you weren't involved in any prior

ANDREW JOE

Page 106

1    attempts?

2          A.      Right.

3          Q.      Why did you try to recover the recording

4    on July 9th in particular?

5          A.      She told me that the suit would be subject

6    to sanctions if she didn't recover it.

7          Q.      And that was the reason she gave you that

8    you needed to try recover the recording?

9          A.      Yes.

10         Q.      And the email her attorney forwarded is

11   from someone named Madison River?

12         A.      Yes.

13         Q.      Who is that?

14         A.      That is one of Tiffany's pseudo names I

15   guess.

16         Q.      Can you explain what you mean by that?

17         A.      To use a false name on an email account so

18   that there's less danger of being hacked and personal

19   information leaking.

20         Q.      Does she have any email accounts that use

21   her own name?

22         A.      I think yes.

23         Q.      So she has some accounts that say Tiffany

24   Hsueh, at least one that says Madison River -- what are

25   her other pseudonyms?

ANDREW JOE

Page 107

1           A.      Those are the only ones I know of.

2           Q.      You said Madison was one, meaning there

3      were others?

4           A.      There could be others.

5           Q.      You are not aware of any others?

6           A.      No.

7           Q.      But you are aware of the Madison Rivers

8      one?

9           A.      Ys.

10          Q.      Why are you aware of that one?

11          A.      I remember it and seeing it here reminded

12     me of it.

13          Q.      You said you recovered the recording on

14     July 9th?

15          A.      Yes.

16          Q.      Can you explain how you recovered it?

17          A.      Yes.  I'm sorry.  I was asked to recover

18     July 9th, and I recovered it July 10th.

19          Q.      How did you recover it?

20          A.      Off of my back up drive.

21          Q.      It was on your back up drive?

22          A.      Yes.

23          Q.      Of your computer?

24          A.      It's a back up drive I use to back up both

25     of our computers.

ANDREW JOE

Page 108

1          Q.     Was it difficult to recover?

2          A.     It took me some time to remember I had the

3     back up drive.

4          Q.     That you had a back up drive or that this

5     was on the drive?

6          A.     It took time to remember that I even had

7     the back up drive, that it would be a place to look for

8     it.

9          Q.     Did you recall the recording would be on

10    the back up drive?

11         A.     I didn't remember it going in.  I just

12    thought I have a back up drive so let me see if it's

13    there.

14         Q.     Is that the only place you looked?

15         A.     No.

16         Q.     Where else?

17         A.     Tiffany's computer.

18         Q.     Was it there?

19         A.     No.

20         Q.     Where was the second place you looked?

21         A.     I looked throughout her computer.  After

22    it wasn't there -- this was on the Saturday -- I looked

23    on her computer, didn't find it, went to sleep.  We

24    went about our business on Sunday.  I checked her

25    computer again, tried to search in a different method,

ANDREW JOE

Page 109

1    and then I remembered that I had the back up drive.

2         Q.      Once you remembered you had the back up

3    drive, how did you go about recovering the recording

4    from there?

5         A.      I plugged it in, and checked one of the my

6    documents folders on the drive.

7         Q.      So once you knew where it was, it wasn't

8    difficult to recover?

9         A.      Right.  I needed to remember I had the

10   drive.

11        Q.      And the drive is the second place you

12   looked?

13        A.      Right.

14        Q.      How did you feel when you were able to

15   recover the recording?

16        A.      I felt relieved.

17        Q.      Why is that?

18        A.      Because we had it, and we could move on

19   with the rest of the case.

20        Q.      How did Tiffany feel or what was Tiffany's

21   response when you told her the recording was recovered?

22        A.      Just that's great and she was going to

23   send it to Josh.

24        Q.      Was the entire recording recovered?

25        A.      As far as I know, yes.

ANDREW JOE

Page 110

1    Q.    How do you know?

2    A.    It's the only recording that I found.

3    Q.    How can you be sure it's the full

4    recording?

5    A.    I can't.  I know I recovered one

6    recording.  It's a recording of Tiffany speaking with

7    another woman, and to me, that's the recording.

8    Q.    I understand, but my point is is it

9    possible that's only part of the recording?

10    MS. CELA:  Objection.

11    A.    I don't know.  It's possible that there's

12    -- I don't know.

13    Q.    Is it possible?

14    A.    I guess it's possible, yes.

15    MS. DIETZ:  I'm going to play just the

16    last 20 seconds. Actually --

17    Q.    Did you listen to the recording when you

18    recovered it?

19    A.    Just the first few seconds.

20    Q.    Why just the first few seconds?

21    A.    Because I wanted to verify it was the

22    recording.  Once I confirmed that, I just turned it

23    over to Tiffany.

24    Q.    Did Tiffany listen to the recording at

25    that time?

ANDREW JOE

1      A.      Yes.

2      Q.      The whole thing?

3      A.      I think so.

4      Q.      Were you there?

5      A.      I was, but I wasn't paying attention.

6      Q.      After she was done listening to the

7  recording, what did she say?

8      A.      I don't remember.  I guess this was it,

9  and she was going to send it to Josh.

10             MS. DIETZ:  I'm going to play the last bit

11        of it.

12             (Whereupon, a recording was played.)

13     Q.      Now the recording cut off mid sentence?

14     A.      I don't know.  I can't really hear

15  anything.

16     Q.      I can play it again.

17             (Whereupon, a recording was played.)

18     Q.      It cuts off in the middle of someone

19  speaking.

20     A.      I guess.  I don't know.

21     Q.      You heard someone speaking and the tape

22  ends, right?

23     A.      Yes.

24     Q.      There's no goodbye.  Someone is speaking

25  and it cuts off, right?

ANDREW JOE

Page 112

1          A.      Right.

2          Q.      And it cuts off.  Someone is speaking and

3     it stops, right?

4          A.      I guess so.

5          Q.      You just heard it, right?

6          A.      Yes.

7          Q.      So isn't it possible there's more to this

8     recording?

9                  MS. CELA:  Objection.

10         A.      I don't know.

11         Q.      I know you don't know.  I'm asking if it's

12    possible.

13                 MS. CELA:  Objection.

14         A.      I guess it's possible, but it could be

15    possible in any number of ways.

16         Q.      What could be possible in any number of

17    ways.

18         A.      Why the recording cut off mid sentence.

19         Q.      Okay.  What are the reasons why the

20    recorder cuts off?

21         A.      My guess would be if the recorder cut out

22    or battery died or storage was full.

23         Q.      Those are possibilities?

24         A.      Yes.

25         Q.      You don't know if that's true.

ANDREW JOE

Page 113

1              A.      No.

2              Q.      So the other possibility is the recording

3      was deleted and only part was recovered?

4                      MS. CELA:   Objection.

5              A.      I don't think that's a possibility.

6              Q.      Why not?

7              A.      There was only one recording.

8              Q.      I understand but how can you be sure it's

9      complete?

10             A.      I can't.

11             Q.      Exactly.  Do you know if Tiffany recorded

12     any other conversations with Allison?

13             A.      No.

14             Q.      You know she didn't or you don't know?

15             A.      I don't know if there are any other

16     recordings.

17             Q.      Do you know if she recorded conversations

18     with anyone else at DFS?

19             A.      No.

20             Q.      Aside from this recording, have you heard

21     any recordings Tiffany made of anyone at DFS?

22             A.      No.

23                     MS. DIETZ:  That's all I have.

24     EXAMINATION

25     BY MR. RIZZO:

ANDREW JOE

1      Q.      Do you know when Tiffany transferred the

2   recording from the recorder to the computer?

3      A.      No.

4      Q.      Do you know how many files were on the

5   recorder?

6      A.      No.

7      Q.      Do you know how many audio files were on

8   the recorder that had to do with the meeting that she

9   recorded with the DFS and the HR person?

10      A.      No.

11      Q.      Do you know where the recorder is now?

12      A.      No.

13      Q.      Do you know if Tiffany still has the

14   recorder?

15      A.      I don't think she does.

16      Q.      Why don't you think she has it?

17      A.      I haven't seen it, and I don't think we

18   have it.

19      Q.      Do you know where she kept the recorder?

20      A.      No.

21      Q.      Did she ever tell you she discarded it?

22      A.      Yes.  That reminds me.  She did say she

23   might have thrown it out when we moved.

24      Q.      When did you move?

25      A.      I believe it was last year.  I want to say

ANDREW JOE

Page 142

1      March, February, March, April of 2015.

2           Q.      Do you know why she would have thrown out

3      the recorder?

4           A.      No.

5           Q.      Was it not functioning?

6           A.      I don't know.  We threw out a lot of stuff

7      when we moved.

8           Q.      Do you know how she got the recorder?

9           A.      I don't know.

10          Q.      Did you give it to her?

11          A.      No.

12          Q.      When you found the file on your hard

13     drive, I take it this was an MP3 file?

14          A.      Yes.

15          Q.      Did you find other MP3 files on the hard

16     drive?

17          A.      Music files, but they were in a separate

18     music folder.

19          Q.      Where was this file?  Was it in a separate

20     folder from the music files?  Was it in a file at all?

21          A.      So on the drive, I think I had it as there

22     was a folder for me, folder for Tiffany.  In the folder

23     for Tiffany, I had made sub-folders.  One was my

24     documents folder.  It was in that my documents folder

25     just there that I found this MP3.

# EXHIBIT 6

Page 1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ---------------------------------------------X
3    TIFFANY HSUEH,
4                        Plaintiff,
5                                    Index No:
          - against -            15 CV 03401
6
     THE NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES
7    a/k/a THE DEPARTMENT OF FINANCIAL SERVICES and
     ABRAHAM GUEVARA, Individually,
8
                        Defendants.
9
     ---------------------------------------------X
10
                        120 Broadway
11                      New York, New York
12                      April 20, 2016
                        10:16 a.m.
13
14
15
16
17
18       EXAMINATION BEFORE TRIAL OF TIFFANY HSUEH, the
19   Plaintiff, pursuant to Notice, taken at the above
20   place, date and time, before MARIA ACOCELLA, a
21   Notary Public within and for the State of New York.
22
23
24
25

Page 174

1              T. Hsueh

2       Q.      You testified that you hadn't

3  seen him in the office since the week after

4  you filed your complaint, right?

5       A.      I saw him one week after I filed

6  the complaint.

7       Q.      And after that, you didn't see

8  him anymore in your office space?

9       A.      Yes.  Like I said, I was not even

10  informed that he was placed on administrative

11  leave, and I wasn't told anything.

12       Q.      Did you have any guesses as to

13  why you weren't seeing him anymore?

14       A.      For all I knew, he could have

15  been on vacation.

16       Q.      For weeks?

17       A.      Like I said, it was just two

18  weeks, at the time.

19       Q.      You thought it was possible he

20  was on vacation for those two weeks, right?

21       A.      I had thought Allison would at

22  least give me the courtesy of telling me an

23  update onto my case, and she would at least

24  be able to relieve my mind.  It would have

25  been nice to have been told that he was

1                     T.  Hsueh
2  placed on administrative leave.
3       Q.     At some point, you did learn he
4  had been placed on administrative leave,
5  right?
6       A.     Not from Allison.
7       Q.     Who did you hear it from?
8       A.     I guess the next time I heard
9  about it, they were taking up a money
10  collection for him for his donation, for his
11  retirement.
12       Q.     And this is when you learned he
13  had been placed on leave?
14       A.     No one specifically told me that
15  he was placed on leave.
16       Q.     Did you ever learn that he was
17  placed on leave?
18       A.     As I stated earlier, that the
19  next thing I knew, people were taking up
20  money for his retirement collection.
21       Q.     Did you at any point learn that
22  he had been placed on leave?
23       A.     As I repeated earlier, my
24  supervisor had instructed me not to say
25  anything.  I was not told anything from

Page 176

1                    T. Hsueh

2   Allison directly, so I had no way of knowing

3   whether he was placed on leave.

4        Q.    I am not asking what Allison told

5   you directly.

6             I am saying at any point, did you

7   learn from anyone -- rumors, whispers,

8   whatever -- that Mr. Guevara had been placed

9   on leave?

10       A.    I am telling you that I was not

11  told by anyone that he had been placed on

12  leave, because my supervisors and Allison had

13  instructed me not to say anything.

14       Q.    So your testimony is that you

15  never learned that Mr. Guevara had been

16  placed on leave?

17       A.    No.  Otherwise, why would I send

18  this e-mail asking for something to relieve

19  my mind?

20       Q.    As of today, are you aware that

21  Mr. Guevara was placed on leave?

22       A.    It is two years from 2014.  Of

23  course, I am aware that he was placed on

24  leave.

25       Q.    When did you learn that?

1                       T. Hsueh

2          A.       When they were taking up the

3    money collection for him for his retirement.

4          Q.       Someone told you at that point

5    that he had been placed on leave?

6          A.       They told me he had retired.

7          Q.       I am asking if you at any point

8    learned he had been placed on leave?

9          A.       I keep repeating it.

10               MR. FRANK:  Off the record.

11               MR. DIETZ:  Not off the record.

12         We are staying on the record.

13               MR. FRANK:  Try to respond very

14         directly to what she is asking.

15         A.       No.  No one ever told me he was

16   placed on leave.

17         Q.       You know today that he was placed

18   on leave, right?

19         A.       I know today because you are

20   telling me.

21         Q.       Today is the first time you

22   learned that Mr. Guevara was placed on leave?

23         A.       Actually, yes.

24               All I know at that point was a

25   few weeks later, people were collecting money

1              T. Hsueh

2        Q.      And you say in your complaint she

3    said, well, you say keep quiet, and you say

4    she said that approximately a dozen times?

5        A.      Yes.

6        Q.      Was it keep quiet, or is it stay

7    silent, that she said approximately a dozen

8    times?

9        A.      I did not record her that day, so

10   I cannot say her exact words.  It was pretty

11   much stay silent.  Be quiet.  Everything will

12   die down.

13       Q.      And you recall she said that

14   approximately a dozen times?

15       A.      Yes.

16       Q.      In how many conversations?

17       A.      As I said, I think -- I believe I

18   had two or three meetings with her, and it

19   was throughout the course of the two or three

20   meetings.

21       Q.      She would just keep repeating

22   stay quiet, stay quiet?

23       A.      Yes.

24       Q.      Didn't she simply tell you the

25   investigation was being kept confidential?

Page 263

1                      T. Hsueh

2    that he had been found guilty of sexual

3    harassment.  Just a notice that he behaved

4    unprofessionally, and that they would like

5    everyone not to invite him back in the

6    building and not on the building premises.

7    There was nothing.

8         Q.     Well, you are aware now that DFS

9    informed building security on August 15th not

10   to let Mr. Guevara back into the building,

11   correct?  Would that not have accomplished

12   allaying your fears?

13        A.     Where are you getting that

14   August 15th?

15        Q.     We have produced it.

16        A.     No.  It does not say anywhere

17   that Abe was not to be allowed back into the

18   building --

19        Q.     In fact, it does.

20        A.     -- by security?

21        Q.     In fact, it does.

22               If there was such a notice dated

23   August 15th, would that have allayed your

24   fears?

25        A.     If it specifically had mentioned

Page 264

1                       T. Hsueh

2    Abe's name, and that he would not to have

3    been allowed back into the building, yes.

4                But that document does not say

5    anything.  It says that I asked for building

6    security phone number.

7        Q.     I am not talking about your

8    e-mail.  I am talking about a notice that was

9    sent to building security on August 15th.

10       A.     Why was none of us informed of

11   this?  As you can see, he was still seen,

12   until December.

13       Q.     Why would you need to be informed

14   of that?  Isn't it enough to tell building

15   security, here is his picture, don't let him

16   in?

17       A.     Clearly, that did not do a good

18   job, because he was seen.

19       Q.     What else should they have done?

20       A.     How was he allowed back in, if

21   they were showing his picture, and he was

22   allowed back in.

23       Q.     What else do you think DFS should

24   have done besides that?

25       A.     They didn't notify any of the