UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

TIFFANY HSUEH,

                         *Plaintiff*,

         *-against-*

THE NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES a/k/a THE
DEPARTMENT OF FINANCIAL SERVICES
and ABRAHAM GUEVARA,

                   *Defendants*.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 24, 2017

15 Civ. 3401 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

      Plaintiff Tiffany Hsueh brings this action against her employer, Defendant New York State Department of Financial Services (the "DFS"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"),[1] and against her former co-worker, Defendant Abraham Guevara, pursuant to New York City Human Rights Law, N.Y.C. Admin. Code § 1801 *et seq.*  She claims that Guevara sexually harassed her and discriminated against her based on her gender, and that his conduct created a hostile work environment that is properly imputed to the DFS.  The DFS and Guevara each move, pursuant to Fed. R. Civ. P. 56, for summary judgment on all claims against them, and Guevara further asserts that if the Court grants summary judgment in favor of the DFS, it should decline to exercise supplemental jurisdiction over Hsueh's state-law claims against him.

---

[1] Hsueh's Complaint also asserts two additional claims against the DFS under the New York City Human Rights Law.  *See* Pl. Compl. at ¶¶ 52-53, 58-59.  However, the DFS argues that these claims are precluded by the Eleventh Amendment, and Hsueh appears to concede this.  DFS Mot. at 11, n.4; Pl. Opp. to DFS Mot. at 1 ("With respect to Defendant DFS, only Title VII applies.").

The Court grants the DFS's motion because Hsueh has failed to establish that Guevara's conduct created a hostile work environment, and, moreover, there is no way to impute his conduct to the DFS. The Court declines to exercise supplemental jurisdiction over Hsueh's state-law claims and accordingly dismisses Hsueh's claims against Guevara without prejudice.

## BACKGROUND

The relevant facts set forth below are either undisputed or, if disputed, viewed in the light most favorable to Hsueh.[2]

Plaintiff Hsueh and Defendant Guevara worked together at the DFS. Hsueh has worked as an Insurance Examiner in the DFS's Property Bureau's Company Regulatory Unit ("CRU") No. 5 since September 2012. DFS's Local Rule 56.1 Statement ("DFS 56.1") ¶¶ 7-8, Dkt. 92. From the time of Hsueh's appointment until his retirement in September 2014, Guevara worked in a different CRU; he was the Supervising Insurance Examiner of the Property Bureau's CRU No. 3. *Id.* ¶ 11. Because Hsueh and Guevara worked in different units, Guevara had no supervisory authority over Hsueh's employment. *Id.* ¶ 13. Hsueh's supervisors have included Marc Allen, the former Principal Insurance Examiner of CRU No. 5, and Jody Wald, the former Supervising Insurance Examiner of CRU No. 5 and Allen's direct superior. *Id.* ¶¶ 9-10. Additionally, Rolf Kaumann was Deputy Chief Examiner of the Property Bureau and indirectly supervised both Hsueh and Guevara. *Id.* ¶ 12.

On July 3, 2014, Hsueh first reported to a supervisor that she was having problems with Guevara. DFS 56.1 ¶ 16. She met with Allen and informed him that she and Guevara had become friends and would go to lunch together sometimes. *Id.* ¶¶ 16–17. She explained,

---

[2] Hsueh purports to dispute many facts based on her inability to confirm them, *see, e.g.*, Pl. Opp. to DFS 56.1 ¶¶ 37–40; however, this is insufficient to raise a genuine issue of material fact, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (explaining that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

however, that during a recent lunch, Guevara stood too close to her on an escalator, pressed himself against her, breathed into her ear, and kissed her on the cheek. *Id.* ¶ 17; Pl. Local Rule 56.1 Statement in Opposition to DFS's Local Rule 56.1 Statement ("Pl. Opp. to DFS 56.1") ¶ 17, Dkt. 95. Further, she informed Allen that Guevara had been calling her and had left her a voicemail. *Id.* Nevertheless, Hsueh told Allen that she did not want to "file a full formal investigation" and only wanted Guevara to be instructed to leave her alone. *See* Def. 56.1 ¶ 19; Pl. Opp. to DFS 56.1 ¶ 19. Allen felt someone more senior should speak with Guevara; he explained to Hsueh that he would report what Hsueh had told him to Wald. Def. 56.1 ¶ 20.

The office was closed the following day for the 4th of July holiday, and both Wald and Guevara were out of the office on vacation the following week. *Id.* ¶ 21. While Guevara was out on vacation, he called Hsueh's office phone six times and left a voicemail stating: "Hello, it's me, Abe. I called to say hi. And hear your voice. Okay, I'll call back later. Goodbye." Pl. Opp. to DFS 56.1 ¶ 22. Hsueh played the voicemail for Allen on July 9, 2014. *Id.* ¶ 23. On July 11, 2014, Allen texted Wald, who was on a cruise at the time, to discuss "an explosive and dangerous personnel issue." DFS 56.1 ¶ 24; Frank Decl. Ex. G, Dkt. 108-8. On July 13, 2014, after finishing his cruise, Wald called Allen, and they discussed the problems Hsueh was having with Guevara and what Hsueh wanted done about it. DFS 56.1 ¶¶ 25, 27; Allen Decl. ¶ 12, Dkt. 86; Wald Decl. ¶ 8, Dkt. 87. Wald then called Kaumann later the same day and relayed to Kaumann what Allen had told him. *See* DFS. 56.1 ¶¶ 28, 30. On July 14, 2014, Wald informed Allen that Kaumann would meet with Guevara that morning. *Id.* ¶ 31.

Kaumann spoke with Guevara as soon as Guevara arrived at the office on July 14, 2014. *Id.* ¶ 33. Kaumann asked Guevara if he had called Hsueh while on vacation and told him that Hsueh had complained about his calls. Pl. Opp. to DFS 56.1 ¶ 33; Guevara Dep. 32–35, Apr. 29,

2016, Dkt. 108-1.  Guevara told Kaumann that he would not call or talk with Hsueh anymore; Kaumann did not tell Guevara to stop speaking to Hsueh.  Guevara Dep. 36–39.  Kaumann then told Allen about his meeting with Guevara.  DFS 56.1 ¶ 34.

Later on July 14, 2014, Allen met with Hsueh and told her that Kaumann had directed Guevara to not contact her further.  *Id.* ¶ 36.  Allen also informed Hsueh that she had the right to file a complaint against Guevara with Human Resources, and Hsueh replied that at that time, she did not want to involve Human Resources or file a complaint; she wanted to "wait and see" before taking further action.  *Id.*

On July 15, 2014, Guevara called Hsueh's phone, but she did not answer; Guevara claims the call was accidental.  *Id.* ¶ 40; Guevara Dep. 81–82.  Hsueh did not report the missed call to her supervisors.  DFS 56.1 ¶ 40.  On July 16, 2014, Wald returned from vacation and met with Hsueh.  *Id.* ¶ 41.  They discussed that Hsueh had already talked with Allen, and Wald informed Hsueh of her right to file a complaint with Human Resources against Guevara.  *Id.*  Hsueh responded that she did not want to report the situation to Human Resources.  *Id.*

Hsueh and Guevara had no further contact until August 5, 2014, when he tried to talk to Hsueh in the hallway, while she was walking to the bathroom.  *Id.* ¶ 43.  Hsueh refused to speak to Guevara, and this was the last time the two spoke.  *Id.* ¶¶ 43–44.  After this incident, Hsueh wrote an email to Allen and Wald informing them that Guevara had tried to speak with her.  *Id.* ¶ 45.  Wald was on an out-of-state assignment from August 4 through August 6, 2014.  *Id.* ¶ 46. On August 7, 2014, Allen and Wald met with Hsueh to discuss her encounter with Guevara.  *Id.* Wald told Hsueh that he would direct Guevara to stop contacting her, and Wald and Allen reminded Hsueh of her right to file a Human Resources complaint against Guevara.  *Id.*  Hsueh indicated she would involve Human Resources if Guevara contacted her again.  *Id.*

Wald was unable to speak to Guevara on August 7, 2014 before Guevara left for the day. *Id.* ¶ 47. The next day (Friday, August 8, 2014) was the DFS's annual picnic on Governor's Island, and Wald was again unable to speak to Guevara. *Id.* ¶¶ 47–48. During the picnic, Guevara followed Hsueh around, then sat two seats away from her on the return ferry. Hsueh Dep. 106–11, Apr. 20, 2016, Dkt. 108-2. Guevara "seemed to want a private moment alone to speak with [her.]" *Id.* 111.

On Monday, August 11, 2014, Hsueh met with Allison Clavery, the DFS's Affirmative Action Officer, to make a sexual harassment complaint against Guevara. DFS 56.1 ¶¶ 52–53. During the meeting, Hsueh described her interactions with Guevara over the last two years. *Id.* ¶ 53; Pl. Opp. to DFS ¶ 53. Clavery provided Hsueh with an internal complaint form and requested that Hsueh complete and return it as soon as possible. DFS 56.1 ¶ 55. After the meeting, Clavery notified the DFS's Labor Relations Officer, Scott Gollop, of the complaint and commenced her investigation. *Id.* ¶¶ 56–57. She contacted five potential witnesses Hsueh had identified and requested each witness schedule an interview and send Clavery any relevant documents and communications. *Id.* ¶ 57. On August 13, 2014, Hsueh submitted a completed DFS complaint form to Clavery and included a list of her interactions with Guevara and supporting photographs. *Id.* ¶ 59.

Hsueh stated in her complaint that Guevara had "been giving [her] candy, pastries, drinks, fruit, popcorn and dropping by [her] cubicle for the 2 years [she'd] known him. The going out to lunch started around the time [she] got married Jan 2014. Then he started escalating the compliments and staring. In May and June it got really, really uncomfortable and the incident in July was the final straw[.] That's when [she] knew he wanted a physical relationship." Clavery Decl. Ex. B at 2, Dkt. 90. Her list attached to the complaint identified

specific examples of the interactions, such as Guevara calling Hsueh "Miss. Beautiful" and asking Hsueh to send him a picture of her from her cell phone. *Id.* at 3–4.

On August 15, 2014, Gollop met with Guevara and informed him that he was being placed on administrative leave effective immediately. DFS 56.1 ¶ 63. This was because the complaint against Guevara involved an element of "touching." *Id.* ¶ 62. Gollop instructed Guevara not to return to the DFS's premises until further notified. *Id.* ¶ 63. A DFS Fraud Investigator escorted Guevara out of the office, and Guevara's building pass was disabled. *Id.* ¶ 65. Gollop notified the building's security desk that Guevara was prohibited from the DFS's premises until further notice. *Id.* ¶ 66. Guevara stopped coming to work after being placed on administrative leave. *Id.* ¶ 71.

Clavery proceeded with her investigation, which involved the review of relevant documents and interviews with six witnesses. *Id.* ¶ 72. Prior to Clavery's interview of one of the witnesses, Hsueh emailed the witness giving the witness permission to speak with Clavery about Hsueh's complaint, and stated: "But please not anything regarding my supervisors. My supervisors did intervene and speak to Abe I highly appreciated that and they have told me they would support me when I filed with HR. I do not hold it against them that Abe chose to continue his behavior." Dietz Decl. Ex. 3, Dkt. 91.

On September 4, 2014, Gollop met Guevara in the lobby of the DFS's offices, escorted him to a conference room, and interrogated him. DFS 56.1 ¶ 76. On September 5, 2014, Guevara sent Gollop an email stating that he had decided to retire, effective September 25, 2014. *Id.* ¶ 77. On September 9, 2014, Guevara sent Gollop an email informing Gollop that he had submitted a formal retirement application the day before (that Monday, September 8, 2014). *Id.*; Gollop Decl. Ex D, Dkt. 89. On September 19, 2014, following his exit interview, Human

Resources escorted Guevara to retrieve his personal items from his desk and to say goodbye to his colleagues.  DFS 56.1 ¶ 80.

Shortly after Guevara's interrogation on September 4, 2014, Gollop informed Clavery that Guevara had decided to retire.  *Id.* ¶ 78.  At that point, Clavery's investigation into Hsueh's complaint was complete except for writing the investigation report, which Clavery completed on December 22, 2014.  *Id.* ¶¶ 79, 85.

Clavery met with Hsueh on January 15, 2015.  *See* Nov. 7, 2016 Clavery Decl. ¶ 2, Dkt. 67.  Hsueh recorded the meeting then later destroyed the recording in bad faith and with an intent to deprive the DFS from using it.  *See* March 31, 2017 Opinion & Order, Dkt. 112.  Although Hsueh was able to retrieve and produce the recording after Defendants brought spoliation motions, the Court determined that the produced recording was incomplete and that the appropriate remedy was an adverse inference.  *Id.*

## DISCUSSION

### I.  Legal Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If there is a genuine dispute of material fact, in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then summary judgment must

not be granted.  *Id.*  However, where a reasonable jury could not return a verdict for the nonmoving party based on the record as a whole, there is no genuine dispute of material fact and summary judgment is appropriate.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.     Claim Against the DFS

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  A hostile work environment claim under Title VII requires the plaintiff to establish: (1) that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (2) that "a specific basis exists for imputing the conduct that created the hostile environment to the employer."  *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir. 1997).  A reasonable jury could not return a verdict in favor of Hsueh on either element.

### A.     Hostile Work Environment

To prevail on a hostile work environment claim, a "plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered."  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).  "This test has objective and subjective elements:  the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  *Id.* at 374 (internal quotation marks omitted).

In determining whether an environment is hostile or abusive, the Court must examine all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see Alfano*, 294 F.3d at 374 ("[C]ourts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse."). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano*, 294 F.3d at 374 (internal quotation marks omitted). But "a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Id.* "Finally, it is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." *Alfano*, 294 F.3d at 374.

Hsueh fails to establish an objectively hostile work environment. The incidents she contends establish a hostile work environment fail to do so. The relevant incidents, which the DFS would have had absolutely no reason to know anything about prior to July 3, 2014, are: (1) Guevara stared at Hsueh's face, chest, and legs multiple times from January 2014 to July 3, 2014; (2) prior to July 3, 2014, Guevara grabbed Hsueh's arm as they walked down the street; (3) Guevara asked Hsueh for her telephone number multiple times; (4) in May 2014, Guevara called Hsueh while on vacation and left her a voice message stating that he missed her and wanted to hear her voice; (5) On July 3, 2014, Guevara followed Hsueh closely on the walk to lunch and bumped into her, grabbed her arm multiple times, stood close to her on an escalator, breathed into her ear, and kissed her between her ear and cheek on an elevator; (6) Guevara left a voice message on July 9, 2014 stating he "called to say hi. And hear [her] voice;" (7) Guevara

called Hsueh six times between July 9 and July 11, 2014; (8) Guevara called Hsueh on July 15, 2014; (9) Guevara stopped Hsueh on her way to the bathroom on August 5, 2014; and (10) Guevara followed Hsueh around and sat two seats away from her on the ferry ride back from a company picnic on Governor's Island on August 8, 2014.  *See* Pl. Opp. to DFS Mot. at 4–6.

Many of these incidents are innocuous and without any clear gender overtones. Guevara's attempts to talk to Hsueh (by phone, while she was on her way to the bathroom, and at the company picnic) may have been irritating and unwelcome, but, as described by Hsueh, they are hardly offensive, threatening, humiliating, or abusive.  Hsueh also does not allege that Guevera made any derogatory or overtly sexual comments during his verbal interactions with her.  Further, the worst of Guevera's conduct—the physical contact—was not severe enough, standing alone, to establish a hostile work environment.  *See Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 177 (2d Cir. 2012) ("Casual contact that might be expected among friends—[a] hand on the shoulder, a brief hug, or a peck on the cheek—would normally be unlikely to create a hostile environment in the absence of aggravating circumstances . . . ." (emphasis omitted)); *Carter v. N.Y.*, 151 F. App'x 40, 41 (2d Cir. 2005) (summary order) ("Three kisses on the cheek in a two-year period, in the absence of any other discriminatory or offensive treatment, do not meet the threshold that this Court has established for hostile work environment claims."). Additionally, the encounters Hsueh complains of were infrequent and isolated in their occurrences:  they occurred over about seven months, from January 2014 to August 2014.[3]

In sum, the incidents, viewed in their totality, are episodic and overall not abusive in degree; they are simply not pervasive or severe enough to alter the terms and conditions of

---

[3] Although not specified, the Court assumes for purposes of this decision that the arm-grabbing incident that occurred prior to July 3, 2014 and Guevara's requests for Hsueh's telephone number took place during this seven-month timeframe.

Hsueh's employment and create an abusive working environment.[4]  No reasonable jury could conclude otherwise, and summary judgment is therefore appropriate.

## B. Imputing Liability to Employer

Summary judgment is also appropriate because there is no basis to impute liability to the DFS.  Where, as here, "the harassment is attributable to a coworker, rather than a supervisor, the employer will be held liable only for its own negligence."  *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (internal quotation marks and alteration omitted).  To impute liability to the DFS, Hsueh would need to show either that the DFS "failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action."  *Id.* (internal quotation marks omitted).  She does neither.

### i. Reasonable Avenue for Complaint

In determining whether a reasonable avenue for complaint exists, "the relevant inquiry is . . . whether defendants provided *no* reasonable avenue of complaint."  *Duch*, 588 F.3d at 762–63 (2d Cir. 2009) (internal quotation marks and emphasis omitted).  The DFS certainly cannot be said to have provided no reasonable avenue of complaint.

All DFS employees are provided with a copy of the DFS's sexual harassment policy when they start working at the DFS, and the policy explains, among other things, that employees should notify the Assistant Director of Administration and Operations of any harassment they experience or witness. DFS 56.1 ¶¶ 1–3; Clavery Decl. Ex. A, Dkt. 90.  This policy is also available at all times through the DFS's intranet.  DFS 56.1 ¶ 3.  Additionally, all employees are

---

[4] The Court would reach the same conclusion even if Hsueh had argued that the relevant conduct included all additional interactions she identified in her internal complaint.  *See* Clavery Decl. Ex. B.

required to complete a mandatory online sexual harassment training course every year, and the course covers the procedures for reporting sexual harassment.  *Id.* ¶ 4.

Specifically, the DFS provides four different avenues for complaint.  DFS employees can report sexual harassment to: (1) their Affirmative Action Officer, (2) the Human Resources Department (including the Assistant Director and Director of Administration and Operations), (3) their Labor Relations Officer, and/or (4) their supervisors and managers.  DFS 56.1 ¶ 5.  As a result, no reasonable jury could find that the DFS failed to provide Hsueh with a reasonable avenue for complaint.  Nor does Hsueh even attempt to argue as much.

### ii.    Knew or Should Have Known About Harassment and Failed to Take Appropriate Remedial Action

"Despite offering a reasonable avenue of complaint to plaintiff, employer defendants can still be held liable if plaintiff can show that they knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'"  *Duch*, 588 F.3d at 763 (internal quotation marks omitted).  "This standard requires a plaintiff to show that (1) someone had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable."  *Id.* (emphasis omitted).

"If the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate."  *Id.* at 766 (emphasis omitted).  The totality of the circumstances must be assessed in determining whether an employer's response was reasonable; "[f]actors to be considered in this analysis are the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment."  *Id.*

Here, a reasonable jury could not find that the DFS failed to take appropriate remedial action. The DFS did not hear of Hsueh's involvement with Guevara until July 3, 2014, when Hsueh informed Allen of, among other things, her lunch with Guevara where he had stood too close to her on an escalator, pressed himself against her, and kissed her on the cheek. Pl. Opp. to DFS 56.1 ¶ 17. But, Hsueh told Allen that she did not want to "file a full formal investigation"; she said that she just wanted Guevara to be directed to leave her alone. *Id.* ¶ 19; DFS. 56.1 ¶ 19. The office was closed the following day for the 4th of July holiday, and Guevara was out of the office on vacation the following week. Def. 56.1 at ¶ 21. As the facts previously recited make clear, the DFS acted with reasonable dispatch in confronting Guevara, with the result that Guevara stated that he would not call or talk with Hsueh anymore. In light of her request, this was a reasonable course of action to try to prevent Guevara's alleged harassment.

But that is not all that her supervisors did. They spoke with Hsueh on three more occasions following her initial report, and each time advised her that she had the ability to report Guevara to Human Resources and file a complaint against him. DFS 56.1 at ¶¶ 36, 41, 46. Despite her assertions that the DFS could or should have done more, *see* Pl. Opp. to DFS Mot. at 16-23, it was not unreasonable for her supervisors to honor her stated wishes that Human Resources not be involved. *See Duch*, 588 F.3d 763–64 (holding that liability could not be imputed to employer after individual assumed to have had duty to convey complaints to management kept plaintiff's complaint confidential because plaintiff stated that she did not want complaint to be reported); *Torres v. Pisano*, 116 F.3d 625, 639 (2d Cir. 1997) ("[T]he law will not presume in every case that harassed members of Title VII's protected classes do not know what is best for themselves and cannot make reasonable decisions to delay—at least for a time— pursuing harassment claims, perhaps for privacy or emotional reasons, until they are ready to do

so."). In fact, Hsueh only ever told her supervisors that she wanted Guevara to be spoken to. Further, nothing about Hsueh's complaints to her supervisors indicates that Guevara's conduct had passed the point where "harassment becomes so severe that a reasonable employer simply cannot stand by, even if requested to do so by a terrified employee." *Duch*, 688 F.3d at 764.

As soon as Hsueh filed her internal complaint, the DFS took swift action to address the issue. While Hsueh has remained employed with the DFS, Guevara was effectively removed from his position from that point on: Guevara was promptly placed on administrative leave, told not to return until further notice, and escorted out of the office. DFS 56.1 ¶¶ 63, 65. Clavery then began a thorough investigation into Hsueh's complaint. She collected and reviewed relevant documents, including Hsueh's and Guevara's personal files, and interviewed six witnesses. *Id.* ¶ 72. Guevara was interrogated on Thursday, September 4, 2014, and sent Gollop an email the next day stating that he had decided to retire, effective September 25, 2014. *Id.* ¶¶ 76–77. At this point, Clavery's investigation into Hsueh's complaint was complete except for writing the investigation report. *Id.* ¶ 79. Given that Guevara was placed on administrative leave on August 13, 2014 and then informed Gollop on September 5, 2014 that he would be retiring, Clavery completed the investigation within a reasonable time, on December 22, 2014. *Id.* ¶ 85. Taken together, the DFS's response was appropriately remedial and prompt, and no reasonable jury could conclude otherwise.

Hsueh's remaining arguments that the DFS's response was unreasonable are without merit. Hsueh asserts that the DFS's response was unreasonable because after she complained to her supervisors, Guevara followed her at the company picnic and sat two seats away from her on the ferry back. *See* Pl. Opp. to DFS Mot. at 18–19. Assuming Guevara's conduct qualifies as harassment, Hsueh fails to show that the DFS's response was dilatory or unreasonable since

Hsueh indicated she was pleased that Guevara had been told not to contact her and that she did not want to involve Human Resources, file a complaint against Guevara, or take any further action. *See* DFS 56.1 ¶ 36; *Duch*, 588 F.3d at 760, 764 (finding no breach of duty where individual assumed to have had to duty to convey complaints to management honored employee's request to keep information confidential and harassment continued after complaint). Next, Hsueh contends that following his retirement, she saw Guevara in the lobby of the building that the DFS's offices are in, and that others had seen Guevara in the DFS's offices on two or three occasions. Pl. Opp. to DFS Mot. at 19-21. However, Hsueh fails to establish that the DFS had any control over Guevara's presence in the lobby, and further, that it was unreasonable or harassing for Guevara to be in the DFS's offices on very limited occasions, particularly when Hsueh did not see him there.

No reasonable jury could conclude that the DFS failed to take effectively remedial and prompt action, and thus, the DFS cannot be held liable.

## III. Claims Against Guevara

Hsueh alleges Defendant Guevara discriminated against her on the basis of her gender through sexual harassment in violation of the New York City Human Rights Law. District courts have jurisdiction over state-law claims that are "so related to claims in the action within [the district court's] original jurisdiction that they form part of the same case or controversy." *See* 28 U.S.C. § 1367(a). A district court may decline to exercise supplemental jurisdiction over a state-law claim where, among other things, it "has dismissed all claims over which it has original jurisdiction." *See* 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to

exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Because the Court grants the DFS's motion for summary judgment on Hsueh's sole federal-law claim, the Court declines to exercise supplemental jurisdiction over Hsueh's state-law claims.

## **CONCLUSION**

The Court grants the DFS's motion for summary judgment and dismisses Hsueh's claim against it with prejudice. Further, the Court dismisses Hsueh's state-law claims against Guevara without prejudice. The Clerk of Court is directed to enter judgment and close this case.

Dated: New York, New York
August 24, 2017

SO ORDERED

PAUL A. CROTTY
United States District Judge